**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Criminal No. 18-00103-EGS-1** |
| | : | |
| **GINA RITA RUSSELL,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S**
**MOTION TO REVIEW AND MODIFY ORDER OF DETENTION**

The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia, hereby submits this Opposition to the Defendant's Motion to Review and

Modify Order of Detention. The defendant is eligible for detention under 18 U.S.C.

§§ 3142(f)(1)(A), 3142(f)(2)(A), and 3142(f)(2)(B).

**APPLICABLE LAW**

A defendant must be detained pending trial, if the Court determines that no condition or

combination of conditions "will reasonably assure the appearance of the person as required and

the safety of any other person and the community . . . ." 18 U.S.C. § 3142(e). A finding of either

risk of flight or danger is sufficient for detention. *See, e.g., United States v. Ferranti*, 66 F.3d 540,

543-44 (2nd Cir. 1995). A finding that a defendant poses a serious risk to obstruct justice also

provides an independent basis to support detention. *See* 18 U.S.C. § 3142(f)(2)(B); *United States

v. Robertson*, 608 F.Supp.2d 89, 92 (D.D.C. 2009). For a detention decision based upon a

defendant's dangerousness, the government must prove by clear and convincing evidence that

there are no conditions or combination of conditions that will assure the safety of the community.

*See* 18 U.S.C. § 3142(f); *United States v. Smith*, 79 F.3d 1208, 1209 (D.C. Cir. 1996). For a

detention decision based upon a serious risk to obstruct justice, the government must prove also

by clear and convincing evidence that there are no conditions or combination of conditions that will reasonably prevent the defendant from obstructing justice. *See Robertson*, 608 F. Supp. 2d at 92. For a detention decision based upon risk of flight, however, the government only need prove by a preponderance of the evidence that there are no conditions or combination of conditions that will assure the defendant's appearance as required. *United States v. Vortis*, 785 F.2d 327, 328-29 (D.C. Cir. 1986); *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996).

At a detention hearing, the government may present evidence by way of a proffer. *United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996). At the hearing, the Court should consider and weigh the following factors: (1) the nature and circumstances of the offense; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g). Each of these factors weighs in favor of detention.[1]

## FACTUAL BACKGROUND

The defendant played a critical role in an extortion, fraud, and money-laundering scheme that caused Daniel Zancan ("Zancan") to embezzle more than $4 million from a local D.C. business over a three-month period in early 2017. The defendant, a self-purported psychic, and her coconspirators worked with and used Hollie Ann Nadel ("Nadel") to perpetrate the scheme, which directly financially benefitted the defendant and her codefendants Robert Evans, who is the defendant's common-law spouse, his brothers Tony John Evans and Corry Blue Evans, and the brothers' parents Archie Kaslov and Candy Evans ("Evans/Kaslov family").

---

[1] Following the defendant's indictment, she was arrested on April 27, 2018 in Los Angeles, California. The Court granted the government's motion for the defendant's detention, finding that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and/or the safety of any person or the community. Def. Russell Rule 5(c)(3) Documents Received from Central District of California (ECF No. 20) at 45-48.

Nadel met the defendant years earlier after the defendant offered Nadel a psychic reading. Although their relationship started as a positive one, it eventually transformed into a highly toxic one in which the defendant exercised great influence over Nadel by exploiting Nadel's belief that the defendant actually had psychic powers. Nadel started serving as a personal assistant to the defendant and her family, booking their vacations, arranging their transportation, and running their personal errands. Nadel also provided the defendant and the Evans/Kaslov family with large amounts of money, initially from Nadel's lawful jobs and then from acts of prostitution and fraud.

Nadel advertised "sensual" massage services on Backpage.com and provided those services in Maryland and the District of Columbia. She used Backpage as a means by which to identify, con, and extort clients, including Zancan, out of money, jewelry, expensive merchandise, and other precious items, which directly benefitted the defendant and the Evans/Kaslov family.

Nadel met Zancan through one of her Backpage advertisements and eventually formed a romantic relationship with him. The defendant claimed through her psychic powers that she "saw money" around Zancan and instructed Nadel to get money from him. Nadel told Zancan a fictional tale that her father had abused her during her youth and attacked her when she confronted him about the abuse years later. Nadel also said that her father initiated legal proceedings against her and that she had become indebted to unidentified "dangerous" people in New York when paying for legal costs associated with the dispute with her father. She claimed that the defendant—her friend of many years—provided her with financial assistance. She also said the dangerous people to whom she owed money held her against her will in New York, sometimes for days at a time, and physically assaulted her. She was able to convince Zancan and other men whom she met on Backpage that these "dangerous" people posed a grave danger to her.

Zancan fell in love with Nadel and tried to help her pay off her alleged debt to the New

York individuals. When Nadel asked him for money to assist in her dispute with her estranged father, he initially provided her about $2,000 or $2,500. He subsequently learned through her that the "dangerous" people in New York demanded ever-greater sums of money to ensure her safety.

Sometime in the beginning of January 2017, the defendant told Nadel that she needed a specific type of watch or watches in connection with the defendant's work with the spiritual world. Nadel asked Zancan to help finance the purchase, so they traveled to a high-end jewelry store in Northern Virginia together. During their trip, Zancan observed Nadel communicating with others via text message and telephone call. Phone records show one incoming call from and four outgoing calls to a phone number associated with the defendant, seven incoming calls from and nine outgoing calls to a phone number associated with Robert Evans,[2] and three outgoing calls to a Florida resort. Email and financial records show that the defendant and the Evans/Kaslov family vacationed at the Florida resort from January 8-10, 2017, and that Nadel booked their vacation.

Although Zancan could not hear the contents of the conversation, Nadel relayed them to him. Because Zancan believed Nadel really was being threatened, he filled out a credit application with the jewelry store. He only obtained $10,000 in credit, however, rendering him unable to purchase the specific watches requested by the conspirators. The defendant became more aggressive with Nadel, acting as though obtaining the watches were a matter of life and death. While they were outside the jewelry store, Zancan told the defendant that he could use his employer's funds to make a cash payment to the New York individuals. Nadel claimed that she did not want to take the risk of Zancan misappropriating company funds, but ultimately agreed with Zancan's plan citing a fear for her safety.

On January 11, 2017, Zancan started embezzling funds from his employer to help Nadel.

---

[2] The government's investigation has revealed that contacts between Nadel and Robert Evans' phone that day were likely communications between Nadel and the defendant.

He began by initiating an approximate $110,000 wire transfer from one of his employer's bank accounts to Nadel's personal Bank of America account. The next day, January 12, 2017, Nadel went to a Bank of America branch in Maryland and obtained a $110,000 cashier's check. As part of the conspiracy, Corry Evans, who had a preexisting relationship with a manager of PLS Financial Services ("PLS") in New York, called the manager to set up his "sister" Hollie Nadel to cash a large check at PLS. Nadel ended up sending screenshots of the front and back of the check to the defendant, who texted them to Corry Evans.

On January 13, 2017, Nadel cashed the $110,000 check at PLS in New York, claiming that she was purchasing a house. The defendant sent Nadel instructions regarding how to act and what to say. Specifically, she sent Nadel the following messages highlighted in yellow.[3]

| Timestamp | From | To | Body |
|---|---|---|---|
| 13/01/2017 22:01:01 (GMT) | ████4478 | ████6684 | Relax while you talk to them don't stutter send him a text telling you what the house looks like |
| 13/01/2017 22:01:15 (GMT) | ████6684 | | Ok thanks |
| 13/01/2017 22:01:42 (GMT) | ████4478 | ████6684 | If you can tell them you're going to go get something to drink next-door because you been in there for hours and while you're outside for two minutes get really a canna Soter and ask him what the house looks like |
| 13/01/2017 22:02:24 (GMT) | ████4478 | ████6684 | If you have time in between call me don't panic this is negativity it's the devil trying to attack you and we will not except it rebuke it in the name of Jesus your powers are coming through |

---

[3]The government's investigation has revealed that the defendant is largely illiterate, but can communicate via text message using smartphones that can serve as speech synthesizers and that can read text aloud.

Tellingly, the third highlighted message provides an example of language the defendant used with Nadel to further Nadel's belief that the defendant had psychic and spiritual powers.

On approximately January 14, 2017, the defendant demanded $350,000 from Nadel. Nadel conveyed the demand to Zancan. As a result, on January 18, 2017, Zancan initiated a $179,860 wire transfer to Nadel, which consisted of stolen funds. Then, on January 19, 2017, he initiated a $171,000 wire transfer to Nadel, which consisted of stolen funds. That same day, Nadel obtained two cashier's checks from her account at TD Bank. One was for $250,000; the other was for $100,000. She called the defendant before leaving the bank, as documented by phone records and the bank's surveillance video. Nadel also sent pictures of the two cashier's checks to the defendant, who sent them to Corry Evans. Nadel also obtained a letter from TD Bank, which indicated that she visited the branch to purchase official checks and that her account balance before obtaining the checks was $351,115.96. The defendant texted Nadel, "Send me a picture of the note arise letter[,]" which Nadel did. The defendant, in turn, sent it to Corry Evans.

Over the next several days, Nadel undertook various actions so she could cash the cashier's checks because PLS initially refused to cash them fearing that they might be fraudulent. She had Zancan create fraudulent documents explaining why she received large wire transfers into her account. She texted Corry Evans and the defendant Zancan's name, title, phone number, and employer's name. She also—upon the direction of the defendant and Corry Evans—created a script of false claims to tell PLS to get them to cash the checks. She saved the script in her email account. The saved draft noted: "Personal shareholder in the company and consultant," "Shareholders personal investments," "Cashing out on one of my investments," "Personal consultant for this company," "2-3 weeks to be cleared for me personal," "Shopping buy jewelry don't want to have to wait for it to be transferred," "Already made 24 hours," "Re investing into

jewelry – I don't know what I want to buy her," "Reinvest," "Don't want to wait weeks." PLS ultimately cashed both checks on January 24, 2017.

On January 20, 2017, four days before PLS cashed the $100,000 and $250,000 cashier's checks, the defendant demanded an additional $500,000 from Nadel. The defendant told Nadel that Tony John Evans would assist with this demand and that she and he discussed having him pose as a mob boss or loan shark named "Tony" to Zancan. That same day, Tony John Evans and Nadel communicated by cellular telephone with Zancan. During that conversation, Tony John Evans threatened harm against Zancan and his family if payments were not made. Zancan feared for his family's safety as well as his own safety. As a result, over the next week, Zancan engaged in a series of fraudulent transactions to raise $500,000.

On January 24, 2017, when Nadel successfully cashed the $100,000 and $250,000 cashier's checks at PLS, Corry Evans, Robert Evans, and Tony John Evans accompanied her. They promptly took control of the cash. That same day, Zancan drove to New York from the Washington, D.C., metropolitan area to pick up Nadel. As Zancan was driving in the area of PLS, Corry Evans texted Tony John Evans, "yo the other guy is 4block away if I text you go get out the block. That will be my last text to you[.]" That same day, Archie Kaslov and Tony John Evans purchased four watches totaling $130,000 at a jeweler in New York.

Three days later, on January 27, 2017, after Zancan had engaged in numerous transactions to fraudulently obtain the requested $500,000 in cash, he drove to New York to deliver the money. As he got closer to New York, Zancan spoke with "Tony," who provided him with further instructions. Zancan went to a room at the Fairfield Inn in Chelsea, where Nadel already had checked in earlier that day. Robert Evans also had checked into a different room at the Fairfield Inn that day. While Zancan was in the hotel room with Nadel delivering the money, the defendant

tried to call Nadel. The two then engaged in the following text exchange. The messages sent by the defendant are highlighted in yellow.

| From | To | Body | Attachments |
|---|---|---|---|
| 27/01/2017 22:39:50 (GMT) | ████6684 | | Call you back |
| 27/01/2017 22:39:54 (GMT) | ████6684 | | In the middle of things |
| 27/01/2017 22:39:56 (GMT) | ████6684 | | Can't talk |
| 27/01/2017 22:40:04 (GMT) | ████4478 | ████6684 | What's the name of the hotel that you rented and text me the number for |
| 27/01/2017 22:40:12 (GMT) | ████4478 | ████6684 | Hotel |
| 27/01/2017 22:40:14 (GMT) | ████6684 | | Fairfield inn 1005 |
| 27/01/2017 22:40:21 (GMT) | ████6684 | | In here now getting money |
| 27/01/2017 22:40:31 (GMT) | ████6684 | | With d |
| 27/01/2017 22:44:41 (GMT) | ████4478 | ████6684 | Call me |
| 27/01/2017 22:46:18 (GMT) | ████6684 | | One sec - not alone yet |
| 27/01/2017 22:47:51 (GMT) | ████4478 | ████6684 | Call me 911 stop acting dumb call me now |
| 27/01/2017 22:48:42 (GMT) | ████4478 | ████6684 | Tony's mad you don't to wait for you to have sex he's going to make a plate Holly what are you doing stop acting stupid |

Of course, the $500,000 cash drop was not the end of the road for the defendant and her codefendants. Instead of being content with having received close to a million dollars from Zancan

at this point in time, the defendant and her codefendants continued to press him for more and more money, which caused him to embezzle a grand total of just over $4 million. The conspirators invented fictional mobsters named "Santino" and "Sammy P," who were supposedly crueler than "Tony." Although "Santino" and "Sammy P" were fictional creations, they seemed very real to Zancan and terrified him. Undeterred by the psychological turmoil that she and her codefendants were unleashing upon Zancan, the defendant remained almost singularly focused on obtaining more money from him. For example, after they demanded additional funds from Zancan, Nadel told Zancan that he needed to call Tony late one night. The defendant engaged in the following exchange with Nadel. The messages sent by the defendant are highlighted in yellow.

| Timestamp | From | To | Body |
|---|---|---|---|
| 05/02/2017 08:16:15 (GMT) | ▮▮▮▮4478 | ▮▮▮▮6684 | Is everything OK |
| 05/02/2017 08:16:22 (GMT) | ▮▮▮▮6684 | | No it's not |
| 05/02/2017 08:16:38 (GMT) | ▮▮▮▮4478 | ▮▮▮▮6684 | What's going on don't let him make any phone calls |
| 05/02/2017 08:16:45 (GMT) | ▮▮▮▮6684 | | It's pushing it too far |
| 05/02/2017 08:16:56 (GMT) | ▮▮▮▮6684 | | He's freaking out about calling Tony |
| 05/02/2017 08:16:59 (GMT) | ▮▮▮▮6684 | | At this hour |
| 05/02/2017 08:17:00 (GMT) | ▮▮▮▮4478 | ▮▮▮▮6684 | OK so what do you want to do |
| 05/02/2017 08:17:10 (GMT) | ▮▮▮▮6684 | | I don't know - trying to calm him down |
| 05/02/2017 08:17:15 (GMT) | ▮▮▮▮4478 | ▮▮▮▮6684 | Tell him to calm down and not to freak out and to get it together |

| 05/02/2017<br>08:17:21 (GMT) | ████6684 | | He's sobbing |
|---|---|---|---|
| 05/02/2017<br>08:17:36 (GMT) | ████4478 | ████6684 | Tell him not to cry tell him that you love him very much Tom everything is going to be OK |
| 05/02/2017<br>08:17:55 (GMT) | ████4478 | ████6684 | Don't worry I have conference he's going to give it to you |
| 05/02/2017<br>08:18:23 (GMT) | ████6684 | | Telling him |

| 05/02/2017<br>08:18:23 (GMT) | ████4478 | ████6684 | Tell him that he would rather deal with Tony Tony is more sensible thing to deal with these crazy nut jobs their animals at least Tony is a more sensible person tell him not to be afraid |
|---|---|---|---|
| 05/02/2017<br>08:18:40 (GMT) | ████6684 | | I did but he's afraid of pissing Tony off |
| 05/02/2017<br>08:18:53 (GMT) | ████6684 | | Calling him 3am before the super bowl |
| 05/02/2017<br>08:19:04 (GMT) | ████4478 | ████6684 | Tell him not to be worried about pissing Tony off time to be worried about losing you because he's going to lose you forever |
| 05/02/2017<br>08:19:10 (GMT) | ████6684 | | Ok |
| 05/02/2017<br>08:20:28 (GMT) | ████4478 | ████6684 | Tell him you feel safer with Tony |
| 05/02/2017<br>08:20:37 (GMT) | ████6684 | | He knows that |
| 05/02/2017<br>08:21:32 (GMT) | ████4478 | ████6684 | He's going to do it don't worry |
| 05/02/2017<br>08:23:18 (GMT) | ████4478 | ████6684 | Tell me you're in danger in that you have no choice |

| | | | |
|---|---|---|---|
| 05/02/2017<br>08:23:40 (GMT) | 6684 | | I know |
| 05/02/2017<br>08:23:52 (GMT) | 4478 | 6684 | What is he saying |
| 05/02/2017<br>08:23:54 (GMT) | 6684 | | Just trying to get him here |
| 05/02/2017<br>08:24:03 (GMT) | 6684 | | Faster |
| 05/02/2017<br>08:24:17 (GMT) | 4478 | 6684 | Do you just want to make a three-way line |

| | | | |
|---|---|---|---|
| 05/02/2017<br>08:25:08 (GMT) | 4478 | 6684 | Tony only have five minutes you have to hurry |
| 05/02/2017<br>08:25:27 (GMT) | 4478 | 6684 | Tell him that they said they're coming back to get you you don't know when it's going to be your scared |
| 05/02/2017<br>08:56:42 (GMT) | 6684 | | You there? |
| 05/02/2017<br>09:35:07 (GMT) | 4478 | 6684 | Tell him that Tony's guy told you that the boss is going to talk to him on Monday |
| 05/02/2017<br>09:35:18 (GMT) | 6684 | | Ok |
| 05/02/2017<br>09:35:28 (GMT) | 4478 | 6684 | That they will not disrupt this weekend because this is their biggest weekend of business |
| 05/02/2017<br>09:35:45 (GMT) | 6684 | | Ok |
| 05/02/2017<br>09:36:57 (GMT) | 4478 | 6684 | Tell me what he is saying |

| 05/02/2017 09:37:43 (GMT) | ████6684 | | He's concerned about Thur and coming up with it so fast |
| 05/02/2017 09:38:01 (GMT) | ████4478 | ████6684 | Help him |
| 05/02/2017 09:38:07 (GMT) | ████6684 | | I will |

Later that day, the defendant asked Nadel how Zancan was doing. When Nadel replied that he was doing better than expected and that they had done good, the defendant instructed Nadel, "Delete your text messages now all of them from me and run out and get a burner phone." This was not the only time the defendant took actions to avoid apprehension in this case.

Ultimately, Zancan embezzled more than $4 million from his employer, nearly all of which ended up in the hands of the defendants. Records from the investigation, including bank statements, reflect large wire transfers from Zancan's employer to multiple gold or precious metal dealers totaling more than $1.9 million. Zancan delivered the gold to the defendants in late March. On Saturday, March 25, 2017, Zancan traveled to New York and awaited instructions regarding delivering the gold. "Tony" called Zancan from a blocked number and told him to go to a specific hotel on Fifth Avenue where Nadel would meet him in the lobby. Zancan brought two suitcases containing the gold to the hotel and met Nadel in the lobby. Per the instructions he had received, Zancan and Nadel went to the empty hotel room, left the gold in the room, and left the room key at the front desk for one of the coconspirators. Notably, seven months later, a gold bar was recovered from Tony John Evans' safe deposit box when the FBI executed a search warrant.

Zancan believed this final payment to the dangerous individuals had secured Nadel's freedom and that she would be released sometime early Monday morning. As a result, Zancan planned to leave New York at approximately 3:00 a.m. on Monday, March 27, 2017, and drive to

12

his workplace. Approximately $80,000 worth of gold that he had purchased was scheduled to be delivered there that day. Zancan planned to convert this gold to cash and use it to get away with Nadel after the dangerous individuals in New York released her. Thus, Zancan drove to his employer on Monday, picked up the gold, and drove back to New York. During the drive, Nadel told him that some sort of turf war had broken out, that "Tony" had been shot by "Santino," and that the individuals in New York were not letting her leave. When Zancan arrived in New York, he exchanged the approximately $80,000 of gold for cash. Nadel told him that the individuals in New York were demanding an additional $50,000 in "protection" money before they released her.

On the evening of March 27, 2017, Zancan met Nadel at a Starbucks north of Times Square and gave her $50,000 in cash. Nadel left with the cash and returned approximately thirty minutes later without it. Zancan and she were then allowed to return to the Washington, D.C. area, but she was instructed to remain in the Washington area. Zancan and Nadel drove to a hotel in the Baltimore area and spent the night there. Zancan turned off his phone. The defendant, posing as "Sammy P," one of the mobsters who was allegedly more dangerous than "Tony," then engaged in the following text exchange with Nadel. Nadel showed the messages to Zancan, which only exacerbated his fear. The defendant sent the messages highlighted in yellow.

----------------------------

Start Time: 3/28/2017 8:18:26 AM(UTC+0)
Last Activity: 7/18/2017 6:05:30 AM(UTC+0)
Participants:         6684 _$!<Home>!$_,         4478 Sammy P
From: From:         4478 Sammy P
Timestamp: 3/28/2017 8:18:26 AM(UTC+0)
Source App: iMessage:         6684
Body:
What the fuck is going on?! What are you two jerk offs hiding? Why is Dan's phone off line? Hollie, Tony could be dying because of you, so if you think your gonna leave and not listen to my instructions you piece of shit, not only will you not be safe from Santino who could find you fucking anywhere and is desperate for you, but I will personally make sure you feel Tony's pain times twenty. Honestly I would fucking enjoy torturing you, after all the fucking drama you have caused you fucking jinx. I was trying to do right by my uncle and that's the only fucking reason

I'm even making any sort of deal. So you better wise up and tell me what the Fuck is going on before things get real fucking ugly and Santino is real fucking horny. He is dying to tap that ass and do all sorts of kinky shit to you.

------------------------------
From: From: ██████6684 _$!<Home>!$_
Timestamp: 3/28/2017 8:27:22 AM(UTC+0)
Source App: iMessage: ██████6684
Body:
Dan got a phone call telling him that with near certainty his work has uncovered the missing money

------------------------------
From: From: ██████4478 Sammy P
Timestamp: 3/28/2017 8:27:47 AM(UTC+0)
Source App: iMessage: ██████6684
Body:
What does that mean

------------------------------
From: From: ██████6684 _$!<Home>!$_
Timestamp: 3/28/2017 8:28:18 AM(UTC+0)
Source App: iMessage: ██████6684
Body:
It means that he can't go back to work

------------------------------
From: From: ██████6684 _$!<Home>!$_
Timestamp: 3/28/2017 8:28:29 AM(UTC+0)
Source App: iMessage: ██████6684
Body:
Or he will be arrested

------------------------------
From: From: ██████4478 Sammy P
Timestamp: 3/28/2017 8:28:40 AM(UTC+0)
Source App: iMessage: ██████6684
Body:
Ok

------------------------------
From: From: ██████4478 Sammy P
Timestamp: 3/28/2017 8:28:45 AM(UTC+0)
Source App: iMessage: ██████6684
Body:
When did I get this phone call

------------------------------
From: From: ██████6684 _$!<Home>!$_
Timestamp: 3/28/2017 8:29:18 AM(UTC+0)
Source App: iMessage: ██████6684
Body:
A couple of hours ago

------------------------------
From: From: ████████4478 Sammy P
Timestamp: 3/28/2017 8:29:34 AM(UTC+0)
Source App: iMessage: ██████6684
Body:
Why don't you tell me and why did you keep this a secret
------------------------------
From: From: ████████4478 Sammy P
Timestamp: 3/28/2017 8:29:42 AM(UTC+0)
Source App: iMessage: ██████6684
Body:
Something doesn't make sense something sounds fishy to me
------------------------------
From: From: ████████4478 Sammy P
Timestamp: 3/28/2017 8:29:51 AM(UTC+0)
Source App: iMessage: ██████6684
Body:
Either he's lying or you're lying about something
------------------------------
From: From: ██████6684 _$!<Home>!$_
Timestamp: 3/28/2017 8:32:06 AM(UTC+0)
Source App: iMessage: ██████6684
Body:
We planned to discuss it with you in the morning when we checked in with you
------------------------------
From: From: ████████4478 Sammy P
Timestamp: 3/28/2017 8:33:05 AM(UTC+0)
Source App: iMessage: ██████6684
Body:
No fucking around
------------------------------
From: From: ████████4478 Sammy P
Timestamp: 3/28/2017 8:33:12 AM(UTC+0)
Source App: iMessage: ██████6684
Body:
I want to know what's going on right now
------------------------------
From: From: ██████6684 _$!<Home>!$_
Timestamp: 3/28/2017 8:34:16 AM(UTC+0)
Source App: iMessage: ██████6684
Body:
That is what is going on - what do we do to stay safe?
------------------------------

From: From: ███████6684 _$!<Home>!$_
Timestamp: 3/28/2017 8:34:25 AM(UTC+0)
Source App: iMessage: ███████6684
Body:
He can't go back to his job
-----------------------------
From: From: ███████6684 _$!<Home>!$_
Timestamp: 3/28/2017 8:34:47 AM(UTC+0)
Source App: iMessage: ███████6684
Body:
So what do you advise us to do?
-----------------------------
From: From: ███████4478 Sammy P
Timestamp: 3/28/2017 8:35:54 AM(UTC+0)
Source App: iMessage: ███████6684
Body:
Just because you paid your debt doesn't mean you're free you have caused more damage than your work you make me so mad sometimes you jinx I want to close until myself and tell him where you're at go ahead and fuck with me I'll find you anywhere you are I promise
-----------------------------
From: From: ███████4478 Sammy P
Timestamp: 3/28/2017 8:37:12 AM(UTC+0)
Source App: iMessage: ███████6684
Body:
If that is in trouble with his job that's not my problem he needs to figure that out for himself but if you think that you're going to run off without me knowing where you're at I will find you myself I made a promise to protect you and you're not going anywhere until Tony as well again
-----------------------------
From: From: ███████4478 Sammy P
Timestamp: 3/28/2017 8:37:22 AM(UTC+0)
Source App: iMessage: ███████6684
Body:
You can run but you can't hide I promise
-----------------------------
From: From: ███████4478 Sammy P
Timestamp: 3/28/2017 8:40:21 AM(UTC+0)
Source App: iMessage: ███████6684
Body:
What are used to fuck oh Schemin up here
-----------------------------
From: From: ███████6684 _$!<Home>!$_
Timestamp: 3/28/2017 8:41:22 AM(UTC+0)
Source App: iMessage: ███████6684
Body:
Sorry Sammy we are not hiding anything, we want your help, we are not trying to run from you
-----------------------------

16

From: From: ██████4478 Sammy P
Timestamp: 3/28/2017 8:42:10 AM(UTC+0)
Source App: iMessage: ██████6684
Body:
U2 liar motherfuckers I want dan's GPS on his phone now you got two minutes turn it on now
------------------------------
From: From: ██████6684 _$!<Home>!$_
Timestamp: 3/28/2017 8:42:33 AM(UTC+0)
Source App: iMessage: ██████6684
Body:
He's turning it on
------------------------------
From: From: ██████4478 Sammy P
Timestamp: 3/28/2017 8:42:48 AM(UTC+0)
Source App: iMessage: ██████6684
Body:
Why the fucking who told him to turn off in the first place
------------------------------
From: From: ██████6684 _$!<Home>!$_
Timestamp: 3/28/2017 8:43:13 AM(UTC+0)
Source App: iMessage: ██████6684
Body:
He said he was scared when he got the phone call
------------------------------
From: From: ██████6684 _$!<Home>!$_
Timestamp: 3/28/2017 8:43:17 AM(UTC+0)
Source App: iMessage: ██████6684
Body:
And that it's on now[4]
------------------------------

The same day that the defendant sent the text messages noted above, Zancan left Baltimore and drove towards Texas, where he hoped to pick up some fraudulent identification documents that he and Nadel could use to escape. When Zancan did not report for work and his employer noticed the financial irregularities with the company's accounts, law enforcement started investigating the case.

On April 4, 2017, the FBI interviewed Nadel via telephone in conjunction with Zancan's

---

[4]The defendant sent numerous other messages in this case. The ones referenced above are just a sampling of the government's evidence.

disappearance and the embezzlement of funds from his employer. That same day, the defendant and Nadel got married in New York for the purpose of creating a purported spousal or marital privilege, which Candy Evans and the defendant believed would prevent Nadel from testifying against the defendant in the future.

On April 6, 2017, Zancan was arrested in New York after Nadel worked with the FBI to lure him to a safe location.

On April 8, 2017, per the instructions of Candy Evans, Nadel and the defendant signed a false confession, which fully implicated the defendant and Nadel in the extortion of Zancan and related fraud offenses and falsely exonerated other members of the Evans/Kaslov family.

On April 26, 2017, and April 27, 2017, the defendant and Candy Evans instructed Nadel to lie to the FBI during an upcoming meeting in Washington, D.C. They counseled Nadel to tell the FBI that there actually never had been an extortion scheme and that Zancan had invented the entire thing about mobsters to justify why he embezzled funds from his employer.

On October 19, 2017, a federal grand jury returned a nine-count indictment against Nadel. Six days later, on October 25, 2017, the FBI executed six search warrants in Manhattan. Agents searched the defendant's residence, other residences of the Evans/Kaslov family, and a safe deposit box belonging to Tony John Evans. While the FBI was executing those warrants, Nadel was in the process of boarding a plane at Washington Reagan National Airport bound for Charlotte, North Carolina. The defendant called Nadel while she was boarding the plane and apprised her of the FBI's actions.

On Thursday, April 19, 2018, a grand jury returned a thirteen-count indictment against the defendant and the Evans/Kaslov family. The grand jury charged the defendant with: (1) conspiracy to commit extortion, bank fraud, and wire fraud, in violation of 18 U.S.C. § 371; (2) interference

with interstate commerce by extortion, in violation of 18 U.S.C. § 1951(a); (3) bank fraud, in violation of 18 U.S.C. § 1344(2); (4) wire fraud, in violation of 18 U.S.C. § 1343; (4) conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); and three counts of tampering with a witness by corrupt persuasion or misleading conduct, in violation of 18 U.S.C. § 1512(b)(3).[5] An arrest warrant was issued for the defendant that same day.

On Tuesday, April 24, 2018, members of the FBI in Los Angeles attempted to execute the arrest warrant against the defendant. However, they were unable to locate the defendant. Thus, undersigned counsel contacted the defendant's then-attorney, advised him of the existence of the arrest warrant, and asked that he have his client surrender herself to the FBI. The attorney informed the government that he apprised the defendant and her family of the outstanding warrant. The defendant failed to surrender herself that day. Defendant's then-attorney again apprised the defendant and her family of the outstanding warrant the next day. The defendant failed to surrender herself the next day. And she failed to surrender herself on Thursday too. Thus, on the morning of Friday, April 27, 2018, after learning of her location, the FBI arrested the defendant in Los Angeles. She was presented before the U.S. District Court for the Central District of California and was ordered held without bond while awaiting transfer to the District of Columbia.[6]

---

[5]The grand jury's indictment is incorporated by reference.

[6]During the week after the defendant was arrested, an FBI agent who is not involved in the investigation reported to the lead case agent that he had retrieved a garbled voicemail that had been left the prior week from a male identifying himself as an attorney for the defendant and who indicated that the defendant needed additional time to turn herself in due to a medical condition. Notably, in the May 30, 2018, report completed by the Pretrial Services Agency for the District of Columbia, the defendant self-reported a medical condition which does not appear as though it would interfere with turning herself into authorities – a point the defendant essentially concedes in her motion. *See* Def.'s Mem. at 3.

**ARGUMENT**

I.     **The Defendant Should Be Detained Pending Trial Because She Poses a Danger to the Community, Is a Substantial Risk of Flight, and Poses a Serious Risk to Obstruct Justice.**

In light of the conduct in this case, the defendant's continued danger to the community, the defendant's lack of lawful employment, the defendant's obstruction-related conduct, and the penalties the defendant faces for perpetrating this scheme, pretrial detention is necessary to ensure both the safety of the community and that the defendant does not flee to evade prosecution.

A.     **The Nature and Circumstances of the Offense**

The nature and circumstances of the offense weigh heavily in favor of detention.

The grand jury found probable cause to believe that the defendant committed Conspiracy to Commit Extortion, Bank Fraud, and Wire Fraud; Interference with Interstate Commerce by Extortion; Bank Fraud; Wire Fraud; Conspiracy to Commit Money Laundering; and Tampering with a Witness by Corrupt Persuasion or Misleading Conduct. Her conduct involved working with Nadel and the Evans/Kaslov family to convince Zancan that mobsters posed a serious danger to Nadel, Zancan, and Zancan's family. She played an active role throughout the fraud, directing Nadel regarding what to say and do. She also pretended to be a violent mobster in text message communications, knowing that Zancan would read those messages and that they would terrify him. Thus, unlike most white-collar fraud cases, which do not involve threats or crimes of violence, the defendant in this case conspired with others to make threats of violence sound and seem very real.

The charges against the defendant expose her to a serious period of incarceration. Bank Fraud (18 U.S.C. § 1344) alone carries a maximum period of incarceration of thirty years. Although the actual sentence imposed is usually less than the statutory maximums, the level of criminal exposure in this case creates a significant incentive for the defendant to flee. *See, e.g.*,

*United States v. Anderson*, 382 F. Supp. 2d 13, 15 (D.D.C. 2005) (citing "maximum penalty of 23 years" in support of detention). Moreover, under the U.S. Sentencing Guidelines, if convicted at trial for Conspiracy to Commit Money Laundering, as charged in Count 5 of the Indictment, and factoring in obstruction of justice as charged in Counts 11-13 of the Indictment, the defendant faces a recommended sentence of 210 to 262 months' incarceration based on an approximate $4.2 million loss amount. As a practical manner, the statutory maximum for conspiracy to commit money laundering is 20 years; thus, the top end of the guideline range would be capped at 240 months' imprisonment. A guideline-recommended sentence where the top end actually exceeds the statutory maximum heavily weighs in favor of detention.

Given the serious offenses alleged in the indictment, the mental torment the defendant and her coconspirators inflicted on Zancan and others, the defendant's integral role in this scheme, and her willingness to obstruct justice, detention is warranted.

### B.    The Weight of the Evidence Against the Defendant

The weight of the evidence against the defendant is strong and weighs in favor of detention. Text messages establish the defendant's key role in the conspiracy. She directed Nadel what to do to get Zancan to embezzle funds. She sent Corry Evans photos of cashier's checks and a TD bank letter. She texted Tony John Evans a picture of Zancan and a picture of a black purse containing bundles of cash. She assumed the role of "Sammy P" and sent Nadel a series of text messages to further terrify Zancan above and beyond the phone calls that had already been placed by Tony John Evans. In addition to the text messages, phone records document the numerous conversations the defendant had with Nadel and members of the Evans/Kaslov family. Moreover, a video recovered from the iCloud account of Robert Evans—the defendant's common-law spouse—shows their minor-aged daughter holding bundles of cash in a Fairfield Inn hotel room, i.e., the

very place where Zancan made a large cash drop, while the defendant can be heard talking to Robert Evans in the background. This is but a mere sampling of the government's evidence against the defendant, but its weight is enormous, and thus, favors detention.

### C.    The History and Characteristics of the Defendant

The history and characteristics of the defendant also weigh in favor of detention.

On October 25, 2017, the defendant was living in New York when FBI agents executed search warrants at several properties, including her Manhattan residence. The searches occurred approximately six months after Nadel met with the FBI and provided false information pursuant to instructions from Candy Evans and the defendant. A half-year had passed by the time the search warrants were executed. From the perspective of the defendant and the Evans/Kaslov family, they probably thought they were in the clear. The day the warrants were executed and Nadel was arrested, however, any thoughts that the defendant and the Evans/Kaslov family had escaped the attention of law enforcement clearly vanished. On that day, agents seized a cellphone previously used by the defendant. They seized co-conspirators' digital devices. They seized a gold bar from Tony John Evans' safe deposit box. They also arrested Nadel. Thus, on October 25, 2017, it was palpably obvious to the defendant that she and the Evans/Kaslov family faced serious legal consequences.

Fewer than six weeks after the search warrants were executed and Nadel was arrested, the defendant moved from New York to California. She had lived in California before and her parents are Golden State residents. Nevertheless, the timing of her move was certainly curious and suggested that she might have moved in hopes that her situation would simply go away. With that stated, she retained California counsel, who reached out to the government a few times while the defendant resided there. Once the grand jury indicted her, FBI agents attempted to arrest her on

Tuesday, April 24, 2018. When they could not locate her, government counsel contacted the defendant's California counsel to inform him that she had been indicted and that there was an outstanding warrant for her arrest. The lawyer informed government counsel that he had communicated instructions that his client turn herself in. The defendant failed to do so that Tuesday. She failed to do so that Wednesday. She failed to do so that Thursday. Thus, on Friday, April 27, 2018, the FBI agents managed to find her and arrest her.

The defendant has no lawful employment. She served as a "psychic" in New York, where she undoubtedly earned money by taking advantage of others. Despite being uneducated and functionally illiterate, she is an expert in matters of manipulation, so much so that she drew Nadel, a college-educated woman, into her web and was able to persuade Nadel to engage in a host of illegal behavior that almost always financially benefitted the defendant and the Evans/Kaslov family.

The defendant played a central role in an elaborate extortion scheme that caused Zancan to embezzle more than $4 million from his D.C. employer. She endeavored to obstruct the investigation on multiple occasions. She left New York within six weeks of search warrants being executed at her residence and other Evans/Kaslov family homes. And she failed to self-surrender on the outstanding arrest warrant, forcing the FBI to track her down and arrest her at her mother's residence. Accordingly, these factors weigh against her release.

### D. The Nature and Seriousness of the Danger to Any Person or the Community Posed by the Person's Release

The fourth factor—the nature and seriousness of the danger to any person or the community posed by the person's release—also weighs in favor of detention. The defendant's release poses a physical danger to the community. She has been indicted for at least one crime of violence, i.e., Interference with Interstate Commerce by Extortion, in violation of 18 U.S.C. § 1951(a). This

offense involves the defendant, aiding, abetting, and participating in making threats of physical harm to Nadel, Zancan, and Zancan's family in order to extort over $4.2 million in money, gold bars, and gold coins out of him.

The defendant's potential release also poses an economic danger to the community, which also is a basis for detention. The legislative history of the Bail Reform Act of 1984 makes clear that Congress intended that the "safety of any other person or the community" language in 18 U.S.C. § 3142 was expected to be given a broad construction. *See* S. Rep. No. 225, 98th Cong., 1st Sess. 12 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3195 ("The reference to safety of any other person is intended to cover the situation in which the safety of a particular identifiable individual, perhaps a victim or witness, is of concern, while the language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. *The Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence.*") (emphasis added). Courts have appropriately construed the statute to find that protection of the community from economic harm is a valid objective of bail conditions. *See, e.g., United States v. Madoff*, 586 F. Supp. 2d 240, 252 (S.D.N.Y. 2009) (noting support for considering economic harm in evaluating danger to the community under § 3142 or the Bail Reform Act); *United States v. Schenberger,* 498 F. Supp. 2d 738, 742 (D.N.J. 2007) (holding that "[a] danger to the community does not only include physical harm or violent behavior" and citing the Senate Committee Report language reproduced above); *United States v. LeClercq,* No. 07-80050-cr, 2007 WL 4365601, at *4 (S.D. Fla. Dec. 13, 2007) (finding that a large bond was necessary to, among other things, "protect the community from additional economic harm"); *United States v. Persaud,* No. 05 Cr. 368, 2007 WL 1074906, at *1 (N.D.N.Y. Apr. 5, 2007) (concurring with the Magistrate Judge that "economic

harm qualifies as a danger within the contemplation of the Bail Reform Act"); *United States v. Gentry,* 455 F. Supp. 2d 1018, 1032 (D. Ariz. 2006) (in a fraud and money laundering case, in determining whether pretrial detention was appropriate, the court held that danger to the community under Section 3142(g) "may be assessed in terms other than the use of force or violence . . . [including] economic danger to the community"); *United States v. Giordano*, 370 F. Supp. 2d 1256, 1270 (S.D. Fla. 2005) ("There can be no question that an economic danger . . . falls under the broad umbrella of 'dangerousness' as that term is used throughout the Bail Reform Act."). The possibility of economic danger to the community if the defendant is released is based on the defendant's proven ability to work with others to perpetrate a multimillion-dollar fraud.

Given the defendant's behavior, she has demonstrated that she poses a serious risk to the safety of the community. Thus, this factor also weighs in favor of detention.

## II.    The Assertions in the Defendant's Memorandum Do Not Justify Her Release.

As justification for her release, offers a "release plan" (Def.'s Mem. at 4 & accompanying attachments), which is no plan at all.  Though the defendant proposes that she be released to Los Angeles to stay with a close friend who happens to be a California-licensed and bail bondsperson, she proffers no financial bond or other arrangement which might incentivize her compliance, and offers no further details or assurances that she (or her friend) will ensure the defendant's compliance with any release conditions and orders set by this Court.[7]  For all of these reasons, there are no circumstances which give the Court any assurance that the defendant will not pose a risk of flight or risk or danger to the community.

---

[7]The defendant raises other factual assertions in her motion.  The government is requesting leave to supplement this opposition, either orally or in writing, pending the outcome of the separately filed Notice of Breach of Debriefing Agreement.

## CONCLUSION

For the reasons noted above, the government respectfully submits that clear and convincing evidence establishes that there are no conditions or combination of conditions that will reasonably assure the safety of any other person and the community. The government also submits that clear and convincing evidence establishes that the defendant poses a serious risk to obstruct justice. The government also submits that a preponderance of the evidence establishes that the defendant is a serious risk of flight and no conditions or combination of conditions will assure her appearance in Court. Accordingly, the government respectfully requests that the Court deny the defendant's motion to review and modify the order of detention.

Respectfully submitted,

JESSIE K. LIU
United States Attorney
for the District of Columbia


By:             /s/
           KONDI KLEINMAN, CA Bar. No. 241277
           DAVID B. KENT, D.C. Bar No. 482850
           Assistant United States Attorneys
           555 4th Street, N.W.
           Washington, D.C. 20530
           (202) 252-6887 (Kleinman)
           (202) 272-7762 (Kent)
           Kondi.Kleinman2@usdoj.gov
           David.Kent@usdoj.gov