**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 18-00103-EGS** |
| | : | |
| **GINA RITA RUSSELL,** | : | |
| **TONY JOHN EVANS,** | : | |
| **ROBERT EVANS,** | : | |
| **CORRY BLUE EVANS,** | : | |
| **ARCHIE KASLOV,** | : | |
| **CANDY EVANS,** | : | |
| | : | |
| **Defendants.** | : | |

# GOVERNMENT'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DECLARE THE CASE "COMPLEX" AND TO EXCLUDE TIME UNDER THE SPEEDY TRIAL ACT

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum and proposed order to the Court in support of its previously-granted oral motion to designate the above-captioned case as complex pursuant to 18 U.S.C. § 3161(h)(7)(B)(ii), and to exclude the time reasonably necessary for effective trial preparation because the ends of justice served by taking such action outweigh the interest of the public and the defendants in a speedy trial.[1]

## FACTUAL BACKGROUND

### I. Indictment – Daniel Zancan

On April 1, 2017, the Honorable Deborah A. Robinson issued an arrest warrant for Daniel

[1] Pursuant to 18 U.S.C. § 3161(h)(1)(D), the government also notes that it is proper for the Court to toll the speedy trial clock from the time of the government's initial oral motion through the ultimate disposition of that motion. *See Bloate v. United States*, 559 U.S. 196 (2010); *United States v. Hemphill*, 514 F.3d 1350, 1357 (D.C. Cir. 2008). Although the Court already has declared this case "complex," the government is supplementing the record that it established orally in Court to ensure that the record is complete.

Zancan ("Zancan"), based on a criminal complaint that charged him with one count of Interstate Transportation of Money Taken by Fraud, in violation of 18 U.S.C. § 2314. On April 6, 2017, Zancan was arrested in New York. On April 20, 2017, a federal grand jury returned an indictment against Zancan, charging him with one count of Bank Fraud, in violation of 18 U.S.C. § 1344(2), and one count of Interstate Transportation of Money Taken by Fraud, in violation of 18 U.S.C. § 2314. The charges stemmed from Zancan's embezzlement of millions of dollars from a local D.C. business where he worked as the Chief Financial Officer.

**II. Indictment – Hollie Ann Nadel**

On October 19, 2017, a federal grand jury returned an indictment against Hollie Ann Nadel ("Nadel"), charging her with one count of Conspiracy to Commit Bank and Wire Fraud, in violation of 18 U.S.C. § 1349, two counts of Bank Fraud, in violation of 18 U.S.C. § 1344(2), one count of Wire Fraud, in violation of 18 U.S.C. § 1343, one count of Interference with Interstate Commerce by Extortion, in violation of 18 U.S.C. § 1951(a), one count of Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h), two counts of Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity, in violation of 18 U.S.C. § 1957, and one count of Tampering with a Witness by Corrupt Persuasion or Misleading Conduct, in violation of 18 U.S.C. § 1512(b)(3). Nadel's charges stemmed from her role in getting Zancan to embezzle funds from his employer. On November 7, 2017, over the objection of Nadel's counsel, the Court found that the matter was a "complex case."

**III. Indictment – Gina Russell, Tony John Evans, Robert Evans, Corry Blue Evans, Archie Kaslov, and Candy Evans**

On April 19, 2018, a federal grand jury returned a thirteen-count indictment against Gina Russell ("Russell"), Tony John Evans, Robert Evans, Corry Blue Evans, Archie Kaslov ("Kaslov"), and Candy Evans. Count One charges Russell, Tony John Evans, Robert Evans, Corry

Blue Evans, and Kaslov with conspiracy to commit extortion, bank fraud, and wire fraud, in violation of 18 U.S.C. § 371. Count Two charges Russell, Tony John Evans, and Robert Evans, with Interference with Interstate Commerce by Extortion, in violation of 18 U.S.C. § 1951(a). Count Three charges Russell and Corry Blue Evans with Bank Fraud, in violation of 18 U.S.C. § 1344(2). Count Four charges Russell and Corry Blue Evans with Wire Fraud, in violation of 18 U.S.C. § 1343. Count Five charges Russell, Tony John Evans, Robert Evans, Corry Blue Evans, and Kaslov with Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h). Counts Six and Eight charge Kaslov with Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity, in violation of 18 U.S.C. § 1957. Count Seven charges Robert Evans with that same crime. Count Nine charges Tony John Evans with that same offense. Count Ten charges Kaslov and Corry Evans with that same offense. Counts Eleven, Twelve, and Thirteen charge Russell and Candy Evans with Tampering with a Witness by Corrupt Persuasion or Misleading Conduct in violation of 18 U.S.C. § 1512(b)(3).

## IV. The Government's Proffer of Evidence

The charges against the defendants in this case stem from an extortion, fraud, and money-laundering scheme that caused Zancan to embezzle more than $4 million from a local D.C. business over a three-month period in early 2017. Russell, a self-purported psychic, and her fellow conspirators worked with and used Nadel to perpetrate the scheme, which directly financially benefitted Russell, her common-law spouse Robert Evans, his brothers Tony John Evans and Corry Blue Evans, and the brothers' parents Kaslov and Candy Evans ("Evans/Kaslov family").

Nadel met Russell years earlier after she offered Nadel a psychic reading. Although their relationship started as a positive one, it eventually transformed into a highly toxic one in which Russell exercised great influence over Nadel by exploiting Nadel's belief that Russell actually had

psychic powers. Nadel started serving as a personal assistant to Russell and the Evans/Kaslov family, booking their vacations, arranging their transportation, and running their personal errands. Nadel also provided Russell and the Evans/Kaslov family with large amounts of money, initially from Nadel's lawful jobs and then from acts of prostitution and fraud.

Nadel advertised "sensual" massage services on Backpage.com and provided those services in Maryland and the District of Columbia. She used Backpage as a means by which to identify, con, and extort clients, including Zancan, out of money, jewelry, expensive merchandise, and other precious items, which directly benefitted the defendant and the Evans/Kaslov family.

Nadel met Zancan through one of her Backpage advertisements and eventually formed a romantic relationship with him. Russell claimed through her psychic powers that she "saw money" around Zancan and instructed Nadel to get money from him. Nadel told Zancan a fictional tale that her father had abused her during her youth and attacked her when she confronted him about the abuse years later. Nadel also said that her father initiated legal proceedings against her and that she had become indebted to unidentified "dangerous" people in New York when paying for legal costs associated with the dispute with her father. She claimed that Russell—her friend of many years—provided her with financial assistance. She also said the dangerous people to whom she owed money held her against her will in New York, sometimes for days at a time, and physically assaulted her. She was able to convince Zancan and other men whom she met on Backpage that these "dangerous" people posed a grave danger to her.

Zancan fell in love with Nadel and tried to help her pay off her alleged debt to the New York individuals. When Nadel asked him for money to assist in her dispute with her estranged father, he initially provided her about $2,000 or $2,500. He subsequently learned through her that the "dangerous" people in New York demanded ever-greater sums of money to ensure her safety.

Sometime in the beginning of January 2017, Russell told Nadel that she needed a specific type of watch or watches in connection with Russell's work with the spiritual world. Nadel asked Zancan to help finance the purchase, so they traveled to a high-end jewelry store in Northern Virginia together. During their trip, Zancan observed Nadel communicating with others via text message and telephone call. Phone records show one incoming call from and four outgoing calls to a phone number associated with Russell, seven incoming calls from and nine outgoing calls to a phone number associated with Robert Evans,[2] and three outgoing calls to a Florida resort. Email and financial records show that Russell and the Evans/Kaslov family vacationed at the Florida resort from January 8-10, 2017, and that Nadel booked their vacation.

Although Zancan could not hear the contents of the conversation, Nadel relayed them to him. Because Zancan believed Nadel really was being threatened, he filled out a credit application with the jewelry store. He only obtained $10,000 in credit, however, rendering him unable to purchase the specific watches requested by the conspirators. Russell became more aggressive with Nadel, acting as though obtaining the watches were a matter of life and death. While they were outside the jewelry store, Zancan told Nadel that he could use his employer's funds to make a cash payment to the New York individuals. Nadel claimed that she did not want to take the risk of Zancan misappropriating company funds, but ultimately agreed with Zancan's plan citing a fear for her safety.

On January 11, 2017, Zancan started embezzling funds from his employer to help Nadel. He began by initiating an approximate $110,000 wire transfer from one of his employer's bank accounts to Nadel's personal Bank of America account. The next day, January 12, 2017, Nadel went to a Bank of America branch in Maryland and obtained a $110,000 cashier's check. As part

---

[2]The government's investigation has revealed that contacts between Nadel and Robert Evans' phone that day were likely communications between Nadel and Russell.

of the conspiracy, Corry Evans, who had a preexisting relationship with a manager of PLS Financial Services ("PLS") in New York, called the manager to set up his "sister" Hollie Nadel to cash a large check at PLS. Nadel ended up sending screenshots of the front and back of the check to Russell, who texted them to Corry Evans.

On January 13, 2017, Nadel cashed the $110,000 check at PLS in New York, claiming that she was purchasing a house. Russell sent Nadel instructions regarding how to act and what to say.

On approximately January 14, 2017, Russell demanded $350,000 from Nadel. Nadel conveyed the demand to Zancan. As a result, on January 18, 2017, Zancan initiated a $179,860 wire transfer to Nadel, which consisted of stolen funds. Then, on January 19, 2017, he initiated a $171,000 wire transfer to Nadel, which consisted of stolen funds. That same day, Nadel obtained two cashier's checks from her account at TD Bank. One was for $250,000; the other was for $100,000. She called Russell before leaving the bank, as documented by phone records and the bank's surveillance video. Nadel also sent pictures of the two cashier's checks to Russell, who sent them to Corry Evans. Nadel also obtained a letter from TD Bank, which indicated that she visited the branch to purchase official checks and that her account balance before obtaining the checks was $351,115.96. Russell texted Nadel, "Send me a picture of the note arise letter[,]" which Nadel did. Russell, in turn, sent it to Corry Evans.

Over the next several days, Nadel undertook various actions so she could cash the cashier's checks because PLS initially refused to cash them fearing that they might be fraudulent. She had Zancan create fraudulent documents explaining why she received large wire transfers into her account. She texted Corry Evans and Russell Zancan's name, title, phone number, and employer's name. She also—upon the direction of Russell and Corry Evans—created a script of false claims to tell PLS to get them to cash the checks. She saved the script in her email account. The

government executed search warrants against two email accounts that Nadel used and retrieved the saved script from one of those accounts. It noted: "Personal shareholder in the company and consultant," "Shareholders personal investments," "Cashing out on one of my investments," "Personal consultant for this company," "2-3 weeks to be cleared for me personal," "Shopping buy jewelry don't want to have to wait for it to be transferred," "Already made 24 hours," "Re investing into jewelry – I don't know what I want to buy her," "Reinvest," "Don't want to wait weeks." PLS ultimately cashed both checks on January 24, 2017.

On January 20, 2017, four days before PLS cashed the $100,000 and $250,000 cashier's checks, Russell demanded an additional $500,000 from Nadel. Russell told Nadel that Tony John Evans would assist with this demand and that she and he discussed having him pose as a mob boss or loan shark named "Tony" to Zancan. That same day, Tony John Evans and Nadel communicated by cellular telephone with Zancan. During that conversation, Tony John Evans threatened harm against Zancan and his family if payments were not made. Zancan feared for his family's safety as well as his own safety. As a result, over the next week, Zancan engaged in a series of fraudulent transactions to raise $500,000.

On January 24, 2017, when Nadel successfully cashed the $100,000 and $250,000 cashier's checks at PLS, Corry Evans, Robert Evans, and Tony John Evans accompanied her. They promptly took control of the cash. That same day, Zancan drove to New York from the Washington, D.C., metropolitan area to pick up Nadel. As Zancan was driving in the area of PLS, Corry Evans texted Tony John Evans, "yo the other guy is 4block away if I text you go get out the block. That will be my last text to you[.]" That same day, Kaslov and Tony John Evans purchased four watches totaling $130,000 at a jeweler in New York.

Three days later, on January 27, 2017, after Zancan had engaged in numerous transactions

to fraudulently obtain the requested $500,000 in cash, he drove to New York to deliver the money. As he got closer to New York, Zancan spoke with "Tony," who provided him with further instructions. Zancan went to a room at the Fairfield Inn in Chelsea, where Nadel already had checked in earlier that day. Robert Evans also had checked into a different room at the Fairfield Inn that day. While Zancan was in the hotel room with Nadel delivering the money, Russell tried to call Nadel. The two then engaged in a text exchange, in which Russell asked Nadel for the name of the hotel.

The $500,000 cash drop was not the end of the road for the defendants. The defendants continued to press Zancan for more and more money, which caused him to embezzle a grand total of just over $4 million. The conspirators invented fictional mobsters named "Santino" and "Sammy P," who were supposedly crueler than "Tony." Although "Santino" and "Sammy P" were fictional creations, they seemed very real to Zancan and terrified him. Undeterred by the psychological turmoil that she and her codefendants were unleashing upon Zancan, Rusell remained almost singularly focused on obtaining more money from him. After additional funds were demanded from Zancan, Nadel told Zancan that he needed to call Tony late one night. Russell engaged in a text exchange with Nadel, instructing Nadel what to do and say. Later that day, Russell asked Nadel how Zancan was doing. When Nadel replied that he was doing better than expected and that they had done good, Russell instructed Nadel, "Delete your text messages now all of them from me and run out and get a burner phone." Fortunately, some of the search warrants the government executed in this case uncovered text messages between the conspirators. As but one example, Nadel's iCloud account contained, among other things, 180 pages worth of text messages between her and Russell.

Ultimately, Zancan embezzled more than $4 million from his employer, nearly all of which

ended up in the hands of the defendants. Records from the investigation, including bank statements, reflect large wire transfers from Zancan's employer to multiple gold or precious metal dealers totaling more than $1.9 million. Zancan delivered the gold to the defendants in late March. On Saturday, March 25, 2017, Zancan traveled to New York and awaited instructions regarding delivering the gold. "Tony" called Zancan from a blocked number and told him to go to a specific hotel on Fifth Avenue where Nadel would meet him in the lobby. Zancan brought two suitcases containing the gold to the hotel and met Nadel in the lobby. Per the instructions he had received, Zancan and Nadel went to the empty hotel room, left the gold in the room, and left the room key at the front desk for one of the coconspirators. Notably, seven months later, a gold bar was recovered from Tony John Evans' safe deposit box when the FBI executed a search warrant.

Zancan believed this final payment to the dangerous individuals had secured Nadel's freedom and that she would be released sometime early Monday morning. As a result, Zancan planned to leave New York at approximately 3:00 a.m. on Monday, March 27, 2017, and drive to his workplace. Approximately $80,000 worth of gold that he had purchased was scheduled to be delivered there that day. Zancan planned to convert this gold to cash and use it to get away with Nadel after the dangerous individuals in New York released her. Thus, Zancan drove to his employer on Monday, picked up the gold, and drove back to New York. During the drive, Nadel told him that some sort of turf war had broken out, that "Tony" had been shot by "Santino," and that the individuals in New York were not letting her leave. When Zancan arrived in New York, he exchanged the approximately $80,000 of gold for cash. Nadel told him that the individuals in New York were demanding an additional $50,000 in "protection" money before they released her.

On the evening of March 27, 2017, Zancan met Nadel at a Starbucks north of Times Square and gave her $50,000 in cash. Nadel left with the cash and returned approximately thirty minutes

later without it. Zancan and she were then allowed to return to the Washington, D.C. area, but she was instructed to remain in the Washington area. Zancan and Nadel drove to a hotel in the Baltimore area and spent the night there. Zancan turned off his phone. Russell, posing as "Sammy P," one of the mobsters who was allegedly more dangerous than "Tony," then engaged in a text exchange and sent messages, which only served to exacerbate Zancan's fear.

The same day that Russell posed as "Sammy P" and sent chilling text messages, Zancan left Baltimore and drove towards Texas, where he hoped to pick up some fraudulent identification documents that he and Nadel could use to escape. When Zancan did not report for work and his employer noticed the financial irregularities with the company's accounts, law enforcement started investigating the case.

On April 4, 2017, the FBI interviewed Nadel via telephone in conjunction with Zancan's disappearance and the embezzlement of funds from his employer. That same day, Russell and Nadel got married in New York for the purpose of creating a purported spousal or marital privilege, which Candy Evans and Russell believed would prevent Nadel from testifying against the Russell in the future.

On April 6, 2017, Zancan was arrested in New York after Nadel worked with the FBI to lure him to a safe location.

On April 8, 2017, per the instructions of Candy Evans, Nadel and Russell signed a false confession, which fully implicated Russell and Nadel in the extortion of Zancan and related fraud offenses and falsely exonerated other members of the Evans/Kaslov family.

On April 17, 2017, Tony John Evans deposited $126,000 in U.S. Currency at a Santander Bank location in New York City. Surveillance video captured the deposit. He then initiated a wire transfer of $195,000 from that account to a Rolls Royce dealership in California to purchase a

2009 Rolls Royce Phantom.

On April 26, 2017, and April 27, 2017, Russell and Candy Evans instructed Nadel to lie to the FBI during an upcoming meeting in Washington, D.C. They counseled Nadel to tell the FBI that there actually never had been an extortion scheme and that Zancan had invented the entire thing about mobsters to justify why he embezzled funds from his employer.

On May 22, 2017, Kaslov and Corry Evans purchased a 2015 Rolls Royce Phantom in Texas. They presented the seller with $320,000 in cash to complete the sale.

On October 25, 2017, six days after the grand jury returned a sealed indictment against Nadel, the FBI executed six search warrants in Manhattan. Agents searched Russell's residence, other Evans/Kaslov family residences, and a safe deposit box belonging to Tony John Evans. While the FBI was executing those warrants, Nadel was in the process of boarding a plane at Washington Reagan National Airport bound for Charlotte, North Carolina. Russell called Nadel while she was boarding the plane and apprised her of the FBI's actions. The FBI interviewed Kaslov that day who denied having traveled to Texas to purchase the Rolls Royce.

On Thursday, April 19, 2018, a grand jury returned the thirteen-count indictment against Russell, Tony John Evans, Robert Evans, Corry Blue Evans, Kaslov, and Candy Evans. Arrest warrants were issued for each defendant that day with the exception of Tony John Evans, who was issued a judicial summons.

On April 25, 2018, Robert Evans, Corry Blue Evans, Kaslov, and Candy Evans surrendered to authorities on the arrest warrants and appeared in this courthouse before the Honorable Deborah A. Robinson for their initial appearance and arraignment. They were held without bond overnight, but then released the next day on electronic monitoring.

On April 27, 2018, Russell was arrested in Southern California when she failed to turn

herself in on the outstanding arrest warrant. She was presented in the U.S. District Court for the Central District of California. Federal Magistrate Judge John McDermott ordered her held without bond pending trial. He also ordered that she be transferred to Washington, D.C.

On April 30, 2018, Tony John Evans appeared in this courthouse before Judge Robinson for his initial appearance and arraignment. He was released on electronic monitoring.

On May 3, 2018, Tony John Evans, Robert Evans, Corry Blue Evans, Kaslov, and Candy Evans appeared before the Court for their initial status hearing. The Court scheduled an additional status hearing for June 29, 2018. The government moved to exclude time between May 3, 2018 and June 29, 2018. The Court found that it was in the interests of justice to exclude that period of time. None of the defendants objected to the exclusion of time.

On May 30, 2018, Russell arrived in the District of Columbia and had her initial appearance before the Honorable G. Michael Harvey. Two days later, on Friday June 1, 2018, Russell appeared before this Court for her initial status hearing. The Court scheduled a subsequent status hearing for June 29, 2018, when Russell's codefendants are scheduled to be in court. During the hearing, the government moved to exclude time under the Speedy Trial Act and asked that the case be designated as a complex case as it previously has. The defense objected to the government request. The Court designated the case as "complex" and excluded time between June 1, 2018, and June 29, 2018.

**V. Discovery**

At this point, the government has provided defense counsel with three discovery productions.[3] The first production consists of 19 discs. Those discs contain extractions of phones (including photos, videos, audio recordings, and text messages) and an iCloud account, video, and

---

[3]The first two productions have been provided to all counsel. The third production has been provided to counsel who have supplied the government with a hard drive.

over 6,000 pages of chat strings between Nadel and others. The second production consists of 996 pages of filings related to pen registers, search warrants, GPS warrants, and 2703(d) orders. The third production consists of approximately 35,000 pages of materials, including travel, phone, bank, credit, ride-sharing, and retail records, as well as FBI 302s and over 500 search warrant photographs. The third production also consists of video files from banks, retail establishments, and residence locations, as well as Daniel Zancan's post-arrest interview with the FBI and jail calls.

The government's forthcoming additional discovery productions will include thousands of additional pages, including additional FBI 302s and search warrant results for additional iCloud and email accounts. Additional discovery also will include hundreds of pages of grand jury transcripts, handwritten notes of agents, and other items. The discovery in this case is both voluminous and complex.

## VI. Legal Standard

Under the Speedy Trial Act ("STA" or "Act"), the Court may exclude time from the speedy trial period if the case is "so unusual" or "complex" due to the "nature of the prosecution." 18 U.S.C. § 3161(h)(7)(B)(ii). Specifically, this section directs the Court to consider the following non-exhaustive list of factors when deciding whether the ends/interests of justice warrant excluding time under the Act:

> Whether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by [the Act].

18 U.S.C. § 3161(h)(7)(B)(ii).

In addition, if the Court determines that the case does not fall under clause (ii), the Court may also consider the following under Section 3161(h)(7)(B)(iv):

> Whether the failure to grant such a continuance in a case which, taken as a whole, is not so unusual or so complex as to fall within clause (ii), would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence.

18 U.S.C. § 3161(h)(7)(B)(iv).

Significantly, "[i]n setting forth the statutory factors that justify a continuance under subsection (h)(7), Congress twice recognized the importance of adequate pretrial preparation time." *Bloate*, 559 U.S. at 210 (*citing* § 3161(h)(7)(B)(ii), (B)(iv)). Given its importance, the need for reasonable time necessary for effective preparation is a ground which Courts of Appeals have routinely held sufficient to grant continuances and exclude the time under the Speedy Trial Act. *United States v. Harris*, 660 F.3d 47, 51 (1st Cir. 2011) (codefendant's counsel requested additional time for effective preparation); *see also United States v. Hudson*, 462 Fed. Appx. 357, 358-59 (4th Cir. 2010) (no error where trial court specifically found that counsel needed the continuance to prepare for trial (*citing* 18 U.S.C. §3161(h)(7)(B)(iv))).

Even in cases with less voluminous discovery than here, courts have found it appropriate to toll the speedy trial clock in the interests of justice in order to permit reasonable time necessary for effective trial preparation. *See, e.g., United States v. Bran*, 2012 WL 4507903, slip op. at 2 (E.D. Va. Sept. 28, 2012) (finding conspiracy to commit murder case sufficiently complex where it involved "over 1,000 pages of written discovery, extensive witness interviews, and . . . additional [forthcoming] discovery"); *United States v. Zar*, 790 F.3d 1036 (10th Cir. 2015) (upholding district court's finding of complex case under Section 3161(h)(7)(B)(ii) based on 30,000 pages of discovery, 29 real estate transactions, and four defendants).

The Court has broad discretion to grant an exclusion of time when, in its view, the case's complexity requires that counsel have additional time to prepare. *See United States v. Rojas-*

*Contreras*, 474 U.S. 231, 236 (1985). A decision to exclude from the operation of the speedy trial clock that delay attributable to the complex nature of a prosecution is committed to the sound discretion of the trial court. *See United States v. Hernandez*, 862 F.2d 17, 24 n.3 (2d Cir. 1988); *United States v. Rice*, 746 F.3d 1074, 1078 (D.C. Cir. 2014).

**VII. This Case Should be Designated Complex**

In view of the factors enumerated in the Act, this case should be designated complex. The case involves six defendants, tens of thousands of pages of discovery, thousands of pages of text and/or iMessage chats, multiple fraudulent bank transfers and withdrawals of U.S. Currency, multiple trips by Zancan to New York to provide money and precious metals to the conspirators, surveillance video, and other electronic evidence. Moreover, the government has gathered a voluminous amount of materials in is investigation, and the volume of produced discovery alone, notwithstanding forthcoming productions, warrants a finding of complexity removing the case from the ordinary time limits of the Act at this time because it would be unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section. For the foregoing reasons, the ends of justice outweigh the interests in a speedy trial.

**VII. Alternatively, Time Should Be Excluded to Allow for Effective Preparation**

Should the Court determine based on the factors discussed above, and any other relevant factors, that this case is not sufficiently complex, then the government requests that the Court exclude time on the ground that failure to grant a continuance would deny the parties the reasonable time necessary for effective preparation, taking into account the exercise of due diligence. 18 U.S.C. § 3161(h)(7)(B)(iv); *United States v. Bieganowski*, 313 F.3d 264, 282 n.15 (5th Cir. 2002) (district court's complex case designation and the decision to grant a continuance based on

the volume of discovery, were consistent with cases interpreting STA). Under these circumstances, if the Court does not believe it is appropriate to make a complexity finding, it would be appropriate to exclude enough time under the Act to allow all parties sufficient time for effective trial preparation.

**CONCLUSION**

For the reasons noted above, the government respectfully submits that the Court has correctly designated this case as "complex" and properly excluded time under the Speedy Trial Act. The government requests that the Court issue the proposed written Order memorializing its findings in this regard.

Respectfully submitted,

JESSIE K. LIU
United States Attorney
for the District of Columbia

By: /s/

DAVID B. KENT, D.C. Bar No. 482850
KONDI KLEINMAN, CA Bar. No. 241277
Assistant United States Attorneys
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-6887 (Kleinman)
(202) 272-7762 (Kent)
Kondi.Kleinman2@usdoj.gov
David.Kent@usdoj.gov