UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.                                                           CRIMINAL
                                                             18-103-EGS
GINA RITA RUSSELL

REPLY IN FURTHER SUPOPORT OF MOTION
TO REVIEW AND MODIFY ORDER OF DETENTION

The Defense agrees that the applicable law, the Bail Reform Act, carries a presumption in favor of release and preference for minimal conditions for release of a defendant.  We disagree that the particulars the Government attributes to Ms. Russell argue for detention rather than release.  There are clearly less restrictive means of securing her future appearances than imprisonment, just as there have been for all the other defendants in this and every indictment that populates the narrative.

As to the factual allegations, the defense disagrees that any extortion occurred in the true sense of the word.  The Government appears to divine Ms. Russell's state of mind from information attributable to separately indicted Holly Ann Nadel, who arguably had a far more "hands-on" role in what looks to be a colossal grift.  The Government bases its extortion charges largely on purported threats to Daniel Zancan, a man indicted for embezzling more than four million dollars from his employer.

The general gist is that Zancan looted his company in order to protect the woman he loved, and- the Government alludes - also the family he loved, from the dire pronouncements of "Tony," the imaginary mobster, as played by TONY EVANS, a co-defendant presently at liberty.

The Government alleges Ms. Russell posed as another fictional mobster, "Sammy P.," who, along with an entirely ethereal "Santino," created texts for Ms. Nadel to show to Mr. Zancan in order to reveal the ferocity of the goons to whom she told him she was beholden. Interestingly, the texts do seem show an undercurrent of sexual tension between the two, which later may be relevant to the charge in the indictment that Ms. Russell and Ms. Nadel married in order to hinder prosecution. More importantly, despite the charges and the loose allegations, it is not clear where Ms. Russell made any actual threats to any person. The notion that this indictment reflects a crime of violence that justifies pre-trial detention of this one defendant is simply an abuse of the term.

We posit that even if everything the Government alleges were true, certainly Ms. Russell played no more a critical role in the scheme than any of the other defendants in this indictment, including Ms. Nadel. From the Government's own detailed description of the reallocation of wealth in the indictment, the conclusion that Ms. Russell, indicted also for her own false confession made in the interests of her co-conspirators, is somehow a legitimate danger to real people in the real world, is ludicrous.

Addressing the Government's contention that Ms. Russell sought to elude capture, the defense points out she was arrested at her home. True, she relocated to her mother's home after the warrant execution, but she remained in touch with the Government through counsel. If anything, she separated herself from the New York household where pretty much every adult was a purported co-conspirator.

It is unclear from the Government's Memorandum in Opposition just where the FBI attempted to locate her. Again, she was arrested in her home, which was   The Government couches the next assertion carefully: "The lawyer informed government counsel that he had communicated instructions that his client turn herself in." Not that he spoke with Ms. Russell;

only a vague assertion that communication had occurred.  Indeed, defense counsel has confirmed what Ms. Russell has oft repeated:  the attorney spoke to her family and never directly to her.  She has stated several that this attorney was her father's counsel for thirty years and that she wanted her own attorney to accompany her.  This is a woman with no criminal record – whose only conviction was for unlicensed driving.  The Government takes the position that once she learned second or third hand that she was expected to surrender that she would understand the timetable involved.  The defense demurs.

      Finally, in making this case, the Government bets the limit on Holly Ann Nadel.  They argue Ms. Russell, an uneducated, functionally illiterate "psychic" manipulated Holly Ann Nadel, a college educated prostitute into participating in the scheme.  The defense responds that it is far, far more likely that if the Government's description of the swindle is accurate, both are culpable.  The reason Ms.  Russell now argues for her release is primarily the vast difference in their skill sets and the fact that the Government has chosen a less likely version of events over all others.

      There is no colorable reason Ms. Russell should be treated differently and worse than every other defendant implicated in this sting.  The Government had set forth no factual basis to differentiate her appreciably from any other alleged participant, and the three-day delay before she was arrested in her own home is hardly sufficient to meet their burden.  She should be afforded the presumption that every other citizen enjoys and she should have her liberty, as described and circumscribed by the Court, pending trial.

Dated: June 28, 2018
      Brooklyn, NY

                                    Respectfully submitted,

                                    *Adam Silverstein*

                                    Adam Silverstein, Esq. AS-8641