UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal No. 18-00103-EGS-1 |
| | : | |
| GINA RITA RUSSELL, | : | |
| | : | |
| Defendant. | : | |

GOVERNMENT'S MEMORANDUM IN OPPOSITION
TO DEFENDANT'S MOTION FOR MODIFICATION OF
PRETRIAL ORDER REGARDING CONDITIONS OF RELEASE

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits this Opposition to the Defendant's Motion to Review and Modify Order of Detention. The government fully incorporates its June 18, 2018, "Memorandum in Opposition to Defendant's Motion to Review and Modify Order of Detention" (ECF No. 30).

FACTUAL BACKGROUND[1]

The defendant, though uneducated and illiterate, is a dangerous woman. She and her co-defendants worked with and used Hollie Nadel ("Nadel") to perpetrate an extortion, fraud, and money-laundering scheme that caused Daniel Zancan ("Zancan") to embezzle more than $4 million from his employer, a local D.C. business, over a three-month period in early 2017.

The Zancan extortion scheme was not the first time the defendant used Nadel to perpetrate a major fraud. On the contrary, several years earlier, the defendant and her mother—the person the defendant says she will live with if she is released from custody—defrauded Nadel's father out of hundreds of thousands of dollars. As but one example of their scheme, which only ended because of the father's refusal to pay any more money, they instructed Nadel to have a "major meltdown"

---

[1] A more fulsome description of the facts is provided in the government's June 18, 2018, memorandum opposing the defendant's release.

and ask her father for $500,000, which was more than Nadel had ever requested from her dad. When the father refused to pay it, Nadel was told to claim the money was for a cutting-edge treatment to erase memories of an earlier molestation. The defendant instructed Nadel to create a "treatment plan" document and send it to her father for the purpose of giving legitimacy to Nadel's financial request. That treatment plan referenced a New York therapist, who happened to be a real person, but someone whom Nadel had never met let alone been treated by. As part of the "meltdown" story, the defendant and her mother told Nadel to tell her father that this therapist was traveling to Los Angeles, where Nadel was living, to help Nadel. Tired of being conned, Nadel's father demanded to speak with the therapist. Undeterred by that obstacle, the defendant's mother impersonated the therapist on a call with Nadel's father and Nadel's mother. The call lasted for one hour, seventeen minutes, and eight seconds.  Nadel's father recorded it.  Tellingly, in an interview with the FBI this summer, the defendant's mother initially vigorously denied ever speaking with Nadel's father or impersonating a psychiatrist. When the agents told her a recording of the call existed, the defendant's mother denied it was her voice on the recording. Then she admitted she did in fact speak with Nadel's parents and that she did in fact impersonate a psychiatrist.

      The defendant instructed Nadel to get money from Zancan, whom Nadel had met through one of her Backpage advertisements. Three months of psychological torment of Zancan followed, in which Zancan ultimately embezzled more than $4 million from his employer, the supermajority of which went to the defendant and her co-defendants.

      After the defendant and her co-defendants had received close to a million dollars from Zancan, the defendant and her codefendants pressed him for more and more money. As part of the scheme, they created fictional mobsters named "Santino" and "Sammy P." Though fictional, they

2

seemed very real to Zancan and terrified him. The defendant played an integral role in perpetrating the psychological turmoil that Zancan underwent. When Zancan finally had embezzled all he could embezzle in an effort to avoid the horrible things that he thought would happen to Nadel, himself, and his family if he did not come up with the money, the defendant was not ready to cease her behavior. Posing as "Sammy P," a particularly dangerous "mobster," she texted Nadel the following message, knowing Nadel would show it to Zancan.

Participants: ▓▓▓▓ 6684 _$!<Home>!$_, ▓▓▓▓ 4478 Sammy P
From: From: ▓▓▓▓ 4478 Sammy P
Timestamp: 3/28/2017 8:18:26 AM(UTC+0)
Source App: iMessage: ▓▓▓▓ 6684
Body:
What the fuck is going on?! What are you two jerk offs hiding? Why is Dan's phone off line? Hollie, Tony could be dying because of you, so if you think your gonna leave and not listen to my instructions you piece of shit, not only will you not be safe from Santino who could find you fucking anywhere and is desperate for you, but I will personally make sure you feel Tony's pain times twenty. Honestly I would fucking enjoy torturing you, after all the fucking drama you have caused you fucking jinx. I was trying to do right by my uncle and that's the only fucking reason I'm even making any sort of deal. So you better wise up and tell me what the Fuck is going on before things get real fucking ugly and Santino is real fucking horny. He is dying to tap that ass and do all sorts of kinky shit to you.

In April 2018 after the defendant, Tony John Evans, Robert Evans, Corry Blue Evans, Archie Kaslov, and Candy Evans were indicted, the Court issued five arrest warrants, including one for the defendant. The FBI attempted to execute the arrest warrants on Tuesday, April 24, 2018, but the defendants were not where the FBI thought they would be. Thus, the government reached out to attorneys for defendants whom the government knew were represented. The defendants who were living in New York or New Jersey agreed to drive to D.C. to surrender themselves the next day and each arrived at the FBI's Washington Field Office early the next morning.

The defendant chose a different path. Government counsel spoke with the defendant's then-attorney on April 24, 2018, at approximately 12:00 p.m. Eastern, i.e. 9:00 a.m. Pacific.

Government counsel informed the attorney that the defendant had been indicted and there was a warrant for her arrest. Government counsel also apprised the attorney of the specific charges and told the attorney to tell the defendant to turn herself in at the FBI Los Angeles Field Office on Wilshire Boulevard. Government counsel also provided the attorney with the name of a Los Angeles FBI agent and the agent's telephone number. The defendant's attorney said he would call the defendant right away and tell her to turn herself in. He subsequently said that following his conversation with the government, he called the defendant's father and told him about the indictment, the warrant, and the need for her to turn herself in. He said the defendant's father, mother, and sister all called him disturbed and said they would put the defendant on a bus to D.C. The attorney apprised them that she needed to turn herself in on the warrant that same day or else the FBI would start looking for her. The defendant did not turn herself in that day.

On information and belief, the government believes its message was communicated to the defendant. She did not turn herself in on Tuesday, Wednesday, or Thursday. Thus, on the morning of Friday, April 27, 2018, after learning of her location, the FBI arrested the defendant in Los Angeles at approximately 7:10 a.m. Pacific time, i.e., approximately 70 hours after the government spoke with her then-attorney and advised him of the charges, the existence of the warrant, and information regarding how to turn herself in to the FBI.

### ARGUMENT

The government's June 18, 2018, "Memorandum in Opposition to Defendant's Motion to Review and Modify Order of Detention" fully sets forth the reasons the defendant should be held pending trial in this case. In addition to the reasons noted in that memorandum, the government submits the following responses to the defendant's most recent motion to modify her conditions of release.

### I. The Defendant's Mother is Not a Suitable Individual with Whom the Defendant Should Live

The defendant notes, "Counsel has confirmed with Defendant's mother that upon her release, Ms. Russell will continue to reside with her at her home." ECF No. 58 at p. 2. As noted above, the defendant is not the only person who has worked with and used Nadel to perpetrate a fraud scheme. On the contrary, the defendant's mother has engaged in fraudulent conduct as well, most notably when she impersonated a therapist in an effort to get Nadel's father to pay large sums of money to her and the defendant. She admitted impersonating the therapist on a call with Nadel's father when the FBI interviewed her this summer. Accordingly, the government does not believe having the defendant live with her mother is a circumstance that should give the Court comfort that the defendant would comply with any conditions of release.

### II. The Defendant is in the Small but Identifiable Group of Particularly Dangerous People Warranting Pretrial Detention

A grand jury charged the defendant with Conspiracy to Commit Extortion, Bank Fraud, and Wire Fraud; Interference with Interstate Commerce by Extortion; Bank Fraud; Wire Fraud; Conspiracy to Commit Money Laundering; and Tampering with a Witness by Corrupt Persuasion or Misleading Conduct. Her conduct involved working with Nadel and her codefendants to convince Zancan that mobsters posed a serious danger to Nadel, Zancan, and Zancan's family. She played an active role throughout the fraud, directing Nadel regarding what to say and do. She also pretended to be a violent mobster in text message communications, knowing that Zancan would read those messages and that they would terrify him. Thus, unlike most white-collar fraud cases, which do not involve threats or crimes of violence, the defendant in this case conspired with others to make threats of violence sound and seem very real. Moreover, unlike her codefendants who promptly self-surrendered upon being informed that there were pending warrants for their arrest,

the defendant did not surrender to authorities. Her conduct both during the fraud scheme and post-indictment positions her in that identifiable group of people warranting pretrial detention.

### III. The Threats Alleged by the Government Do Not Rely Heavily on the Interpretation of Text Messages

The threats and psychological turmoil the defendant helped perpetrate do not rely heavily on the interpretation of text messages. The defendant sent Nadel the texts highlighted in yellow.

| Timestamp | From | To | Body |
|---|---|---|---|
| 05/02/2017 08:16:15 (GMT) | ▨4478 | ▨6684 | Is everything OK |
| 05/02/2017 08:16:22 (GMT) | ▨6684 | | No it's not |
| 05/02/2017 08:16:38 (GMT) | ▨4478 | ▨6684 | What's going on don't let him make any phone calls |
| 05/02/2017 08:16:45 (GMT) | ▨6684 | | It's pushing it too far |
| 05/02/2017 08:16:56 (GMT) | ▨6684 | | He's freaking out about calling Tony |
| 05/02/2017 08:16:59 (GMT) | ▨6684 | | At this hour |
| 05/02/2017 08:17:00 (GMT) | ▨4478 | ▨6684 | OK so what do you want to do |
| 05/02/2017 08:17:10 (GMT) | ▨6684 | | I don't know - trying to calm him down |
| 05/02/2017 08:17:15 (GMT) | ▨4478 | ▨6684 | Tell him to calm down and not to freak out and to get it together |

6

| Date/Time | From | To | Message |
|---|---|---|---|
| 05/02/2017 08:17:21 (GMT) | ███6684 | | He's sobbing |
| 05/02/2017 08:17:36 (GMT) | ███4478 | ███6684 | Tell him not to cry tell him that you love him very much Tom everything is going to be OK |
| 05/02/2017 08:17:55 (GMT) | ███4478 | ███6684 | Don't worry I have conference he's going to give it to you |
| 05/02/2017 08:18:23 (GMT) | ███6684 | | Telling him |

| Date/Time | From | To | Message |
|---|---|---|---|
| 05/02/2017 08:18:23 (GMT) | ███4478 | ███6684 | Tell him that he would rather deal with Tony Tony is more sensible thing to deal with these crazy nut jobs their animals at least Tony is a more sensible person tell him not to be afraid |
| 05/02/2017 08:18:40 (GMT) | ███6684 | | I did but he's afraid of pissing Tony off |
| 05/02/2017 08:18:53 (GMT) | ███6684 | | Calling him 3am before the super bowl |
| 05/02/2017 08:19:04 (GMT) | ███4478 | ███6684 | Tell him not to be worried about pissing Tony off time to be worried about losing you because he's going to lose you forever |
| 05/02/2017 08:19:10 (GMT) | ███6684 | | Ok |
| 05/02/2017 08:20:28 (GMT) | ███4478 | ███6684 | Tell him you feel safer with Tony |
| 05/02/2017 08:20:37 (GMT) | ███6684 | | He knows that |
| 05/02/2017 08:21:32 (GMT) | ███4478 | ███6684 | He's going to do it don't worry |
| 05/02/2017 08:23:18 (GMT) | ███4478 | ███6684 | Tell me you're in danger in that you have no choice |

7

| Date/Time | From | To | Message |
|---|---|---|---|
| 05/02/2017 08:23:40 (GMT) | ▇6684 | | I know |
| 05/02/2017 08:23:52 (GMT) | ▇4478 | ▇6684 | What is he saying |
| 05/02/2017 08:23:54 (GMT) | ▇6684 | | Just trying to get him here |
| 05/02/2017 08:24:03 (GMT) | ▇6684 | | Faster |
| 05/02/2017 08:24:17 (GMT) | ▇4478 | ▇6684 | Do you just want to make a three-way line |
| 05/02/2017 08:25:08 (GMT) | ▇4478 | ▇6684 | Tony only have five minutes you have to hurry |
| 05/02/2017 08:25:27 (GMT) | ▇4478 | ▇6684 | Tell him that they said they're coming back to get you you don't know when it's going to be your scared |
| 05/02/2017 08:56:42 (GMT) | ▇6684 | | You there? |
| 05/02/2017 09:35:07 (GMT) | ▇4478 | ▇6684 | Tell him that Tony's guy told you that the boss is going to talk to him on Monday |
| 05/02/2017 09:35:18 (GMT) | ▇6684 | | Ok |
| 05/02/2017 09:35:28 (GMT) | ▇4478 | ▇6684 | That they will not disrupt this weekend because this is their biggest weekend of business |
| 05/02/2017 09:35:45 (GMT) | ▇6684 | | Ok |
| 05/02/2017 09:36:57 (GMT) | ▇4478 | ▇6684 | Tell me what he is saying |

8

| Date/Time | From | To | Message |
|---|---|---|---|
| 05/02/2017 09:37:43 (GMT) | ████6684 | | He's concerned about Thur and coming up with it so fast |
| 05/02/2017 09:38:01 (GMT) | ████4478 | ████6684 | Help him |
| 05/02/2017 09:38:07 (GMT) | ████6684 | | I will |

Those text messages are subject to one interpretation. The defendant asked Nadel if Zancan was okay. Nadel told the defendant no and that having Zancan call Tony at this hour was pushing things too far. Zancan was sobbing thinking about it. The defendant told Nadel to tell Zancan that he would rather deal with Tony than the crazy nut job animals, i.e., the mobsters who are much more ruthless than Tony. The meaning of the text messages is clear.

### IV.    The Defendant Already Has Shown a Willingness to Obstruct Justice

The grand jury charged the defendant with three counts of tampering with a witness by corrupt persuasion or misleading conduct, in violation of 18 U.S.C. § 1512(b)(3). Thus, the defendant already has demonstrated a willingness to obstruct justice. The grand jury found as much when they indicted her. Moreover, the defendant sent Nadel a text message during the conspiracy, which said, "Delete your text messages now all of them from me and run out and get a burner phone." With respect to the assertion that she has no objection to a stay away/no contact order prohibiting her from contacting any of her co-defendants, one co-defendant already has informed the government that the defendant and the co-defendant have spoken via telephone while she has been incarcerated in this case. The government is not suggesting that the defendant was endeavoring to obstruct justice when she spoke with that co-defendant, merely pointing out that she has spoken with at least one co-defendant since her incarceration.

## V. The Defendant's Employment Status

The defendant asserts, "Notwithstanding the government's claim that at the time of her arrest Ms. Russell was unemployed, to the contrary, Ms. Russell was lawfully self-employed." ECF No. 58, at p. 5. The defendant offers no further details regarding this alleged lawful self-employment. To the extent the "lawful" self-employment consisted of being a psychic, the government would note that this line of work seems predicated on scamming individuals out of their money. Moreover, when interviewed by Pretrial Services in D.C., the defendant reported being unemployed.

## VI. The Defendant's Exposure to Incarceration

The defendant's exposure to a lengthy prison sentence favors pretrial detention. *See United States v. Tomero*, 169 Fed. Appx. 639, 641 (2d Cir. 2006) (noting that despite the defendant's citizenship, lack of criminal history, "solid" employment record, and "substantial bail package," he was a danger to the community where a gun and cocaine were found in his home and *"despite his ties to the community, defendant's potential for a fifteen-year sentence created a substantial risk of flight that remained a serious concern even when viewed in light of the defense proffer"*) (emphasis added).

## VII. The Weight of the Evidence is Enormous

The weight of the evidence is indeed one factor that the Court should consider in determining pretrial detention, and here, it is very strong and weighs in favor of detention. Moreover, contrary to the defense's assertion, the government has not exaggerated the mental torment Zancan experienced as a result of the defendant and her co-conspirators' actions. The fact that he embezzled approximately four million dollars from his employer for the benefit of others and not himself speaks volumes. The government has already set forth a portion of the evidence

demonstrating the fear that was instilled in Zancan. In addition to the text messages noted above, Tony John Evans, playing the role of "Tony," called Zancan one day and asked him if Zancan wanted Tony to tell Zancan where Zancan's kids went to school. The implication from that call was clear: we can get to your family and we can get to your kids. In addition, during one of Zancan's trips to New York to drop off cash for the conspirators, Nadel sent Zancan a picture of the car Zancan was driving; the photograph had been taken from behind Zancan's car. Nadel explained to Zancan that he was being followed and that she had received the photograph via text message from the individuals requesting payment. Such actions are the epitome of mental torment.

### VIII. The Defendant's Surrender

The government told the defendant's then-attorney to have her surrender to the FBI. She chose not to surrender the day that the government called her attorney or the next day or the following one either. Moreover, contrary to the defense assertion that there were only 48 hours between the government providing notice to the defendant's attorney about the existence of the arrest warrant and her arrest, her attorney was contacted on Tuesday at approximately 9:00 a.m. Pacific time, April 24, 2018. She was arrested at approximately 7:10 a.m. on Friday, April 27, 2018. Approximately 70 hours elapsed between the time the government notified her attorney and the defendant's arrest.[2]

### CONCLUSION

For the reasons noted in the government's June 18, 2018, "Memorandum in Opposition to Defendant's Motion to Review and Modify Order of Detention" and the reasons noted above, the government respectfully submits that clear and convincing evidence establishes that the defendant

---

[2] The government also notes that defendant's prior counsel advanced arguments that the defendant did not know that there was an outstanding arrest warrant because that information was not communicated by her Los Angeles counsel. The Court asked her then-attorney if he had obtained an affidavit or some other statement from Los Angeles counsel. The defendant has not provided any such affidavit, or even statement, in conjunction with her motion.

poses a serious risk to obstruct justice. The government also submits that a preponderance of the evidence establishes that the defendant is a serious risk of flight and no conditions or combination of conditions will assure her appearance in Court. Accordingly, the government respectfully requests that the Court deny the defendant's motion to review and modify the order of detention.

    Respectfully submitted,

    JESSIE K. LIU
    United States Attorney
    for the District of Columbia

By:     /s/
    KONDI KLEINMAN, CA Bar. No. 241277
    DAVID B. KENT, D.C. Bar No. 482850
    Assistant United States Attorneys
    555 4th Street, N.W.
    Washington, D.C. 20530
    (202) 252-6887 (Kleinman)
    (202) 272-7762 (Kent)
    Kondi.Kleinman2@usdoj.gov
    David.Kent@usdoj.gov