UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 18-00103-EGS |
| | : | |
| v. | : | |
| | : | |
| TONY JOHN EVANS, | : | |
| ROBERT EVANS, | : | |
| CORRY BLUE EVANS, | : | |
| ARCHIE KASLOV, | : | |
| CANDY EVANS, | : | |
| | : | |
| Defendants. | : | |

**GOVERNMENT'S REPLY TO OPPOSITION FOR AN ORDER
REQUIRING THE DEFENDANTS TO SUBMIT TO A BUCCAL SWAB**

The United States of America, by its undersigned attorney, the United States Attorney for the District of Columbia, hereby submits this reply to Defendant Corry Blue Evans's Opposition to the Government's Motion for an Order Requiring the Defendants to Submit to a Buccal Swab, ECF No. 184.[1]

**PROCEDURAL BACKGROUND**

The government filed its initial motion on July 22, 2019. ECF No. 143. As it noted in that motion, Defendants Archie Kaslov and Robert Evans did not oppose the government's request to take buccal swabs, Defendant Corry Blue Evans did not consent to the government's request to take buccal swabs, and Defendant Candy Evans had not yet expressed a position at the time of the filing. *Id.*, at 1 n.1. On September 3, 2019, this Court granted the government's motion. ECF No. 173.

The parties appeared before this Court for a status hearing on Thursday, September 19, 2019. Defendants Robert Evans, Corry Blue Evans, and Archie Kaslov appeared (with counsel),

---

[1] Defendants Robert Evans and Candy Evans join Defendant Corry Blue Evans's opposition.

and counsel for Defendant Candy Evans (whom the Court excused for medical reasons) appeared by telephone.  During the hearing, the government informed the Court and the Defendants that it intended to have agents with the Federal Bureau of Investigation take buccal swabs of Defendants Robert Evans, Corry Blue Evans, and Archie Kaslov following the hearing pursuant to this Court's Order.  No one raised any objection.

Following the hearing, the FBI swabbed Defendant Robert Evans.  Immediately after or around that same time, counsel for Corry Blue Evans raised an objection to the Court's order.  Defendant Archie Kaslov, presumptively influenced by counsel for Corry Blue Evans's actions, did not have his buccal swab taken either.[2]  Counsel for Corry Blue Evans did not file an opposition during the 42 days that the motion was under advisement or during the 16 days *after* the Court issued an order granting the motion.  Counsel also did not raise the issue during the September 19th status hearing even though the government noted that it intended to have agents take buccal swabs after the hearing.  Based on the entire record, the government opposed counsel for Corry Blue Evans's request to late file a motion opposing the order.[3]

---

[2]     During the September 19, 2019, status hearing, the government noted for the Court its concerns that counsel for one of the defendants was potentially advising other defendants in the case.  The government fully understands that in a case like this, where the codefendants are all close family members, that legal advice offered by an attorney to his or her respective client might be passed along by the client to his or her co-defendant family members.

[3]     The government has consented to counsel late filing other motions in this case and would not have opposed a reasonable request to late file here.  *See* ECF No. 159 (Defense Counsel for Robert Evans' noting that the government did not oppose her request to late file motions to suppress the search of her client's iCloud account and cell phone); ECF No. 166 at 5 n.9 (Government noting in its Opposition to Defendants' Omnibus Motions that it did not object to Corry Blue Evans' request for additional time to file further motions); ECF No. 177 (Government noting that it provided thirty additional days for Person A to file a petition in the forfeiture ancillary proceeding related to property forfeited in connection with Tony John Evans' sentence because Person A's attorney was addressing a personal family matter; notably, counsel for Corry Blue Evans requested an extension of time to file a petition on behalf of his client, but failed to respond

The parties requested that the case be recalled to address the issue. Once the case was recalled, counsel for Defendant Corry Evans requested leave to late file an opposition to the Government's Motion for an Order Requiring the Defendants to Submit to a Buccal Swab, but offered no reasonable justification or excuse for failing to file an opposition to the government's motion or even to raise an objection earlier during the hearing. To avoid any later claim of ineffectiveness of counsel, however, the Court granted Defendant Corry Blue Evans's motion. The Court also granted the oral motion of Defendants Robert Evans, Archie Kaslov, and Candy Evans to join Defendant Corry Evans's motion. Defendant Corry Evans filed his opposition on September 20, 2019. ECF No. 184.[4]

## ADDITIONAL FACTUAL BACKGROUND

Count One of the Indictment alleges that Gina Russell, Tony John Evans, and Defendants Robert Evans, Corry Blue Evans, and Archie Kaslov conspired to commit extortion, bank fraud, and wire fraud, from in or about November 2016 through in or about April 2017, for the purpose of enriching themselves. The indictment further alleges that the manner and means by which the purposes of the conspiracy were carried out included: Hollie Ann Nadel ("Nadel") and other conspirators telling Daniel Zancan ("Zancan"), James Padilla, and Individual A that Nadel purportedly owed large sums of money to the other conspirators and that the other conspirators would injure, kidnap, and unlawfully confine her unless the debt was paid; the conspirators

---

to the government's request both that he clarify why he could not file a petition based on the information he had and what sort of extension he was seeking).

[4]   On September 21, 2019, Defendant Archie Kaslov withdrew his oral motion to join Defendant Corry Blue Evans's Opposition to the Government's Motion for an Order Requiring the Defendants to Submit to a Buccal Swab, and notified the Court that Defendant Archie Kaslov agrees to submit to a buccal swab as previously ordered. ECF No. 185. On September 23, 2019, Defendant Candy Evans filed a notice formally joining and adopting Defendant Corry Blue Evans's Opposition to the Government's Motion for an Order Requiring the Defendants to Submit to a Buccal Swab. ECF No. 186.

threatening to injure Zancan and his family unless Zancan paid the conspirators; the conspirators causing Zancan to obtain money from two D.C.-based companies under false pretenses to make payments to conspirators; and the conspirators making false statements and providing false documents to financial institutions to conceal the true nature of payments from Zancan to conspirators. The indictment further alleges dozens of overt acts committed in furtherance of the conspiracy.[5]

As alleged as part of Count One of the Indictment, ECF No. 1, the government will present evidence that on or about January 13, 2017, Nadel and Defendants Robert Evans and Corry Blue Evans went to PLS Financial Services in New York and cashed the cashier's check in the amount of $110,010.00. Nadel provided the cash to Defendants Robert Evans and Corry Blue Evans, who brought the cash to Tony John Evans's residence at 517 Third Avenue, New York, New York, where Defendants Robert Evans, Corry Blue Evans, Kaslov, Candy Evans, and Russell divided the money. Defendant Robert Evans posted a photo of the money on the dining room table in Tony John Evans's residence on Instagram. While the money was at Tony John Evans's residence,

---

[5] At a trial involving Defendant Candy Evans, the government expects to present evidence that she was directly involved in the scheme to extort Zancan. During the scheme, Russell directed Nadel to provide financial support and sometimes would instruct Nadel to speak with Defendant Candy Evans (and Defendant Robert Evans) with respect to the financial demands. In addition, in January 2017, Defendant Candy Evans told Russell that Defendant Robert Evans (Defendant Candy Evans's son and Russell's common-law spouse) needed money and that Defendant Candy Evans needed a watch to recoup money Defendant Candy Evans had spent during her custody battle with Russell. Defendant Candy Evans said she also needed a second watch, a Rolex, which she had promised to give to her attorney from that custody case. (Defendant Candy Evans also demanded that Russell pay her attorney's fees from that case.) Russell, who was on vacation in Florida, called Nadel and instructed her to get a watch. During the call, after Russell heard a male voice in the background (i.e., Zancan) tell Nadel that he would provide cash instead of a watch, Russell told Nadel that cash was acceptable. Russell demanded approximately $120,000 from Nadel. Russell informed Defendant Candy Evans that she was obtaining cash instead of the watch, and Defendant Candy Evans expressed her approval.

Defendant Archie Kaslov retrieved a silver handgun with a black handle and took a photo of the money and jewelry which had been purchased.[6]

On or about January 20, 2017, Tony John Evans and Nadel communicated by cellular telephone with Zancan to threaten harm against Zancan and his family if payments were not made to Tony John Evans and other individuals. *See, e.g.,* U.S. v. Tony Evans, 18-CR-103 (EGS), Statement of Offense, ECF No. 74 ¶ 14(l).

On or about January 27, 2017, at the direction of Nadel, Zancan drove from the Washington, D.C. metropolitan area to New York to deliver $500,000 in cash to Gina Russell, Nadel, Tony John Evans, and Defendants Robert Evans, Corry Blue Evans, Archie Kaslov, and Candy Evans.

On or about January 27, 2017, Tony John Evans communicated by cellular telephone with Zancan and directed Zancan to drive to a specific location in New York, New York. Tony John

---

[6] At a trial involving Defendant Candy Evans, the government also expects to present evidence that on or about January 19, 2017, Nadel traveled to PLS Financial Services in New York to cash the cashier's checks in the amounts of $250,000.00 and $100,000.00 but had difficulty cashing the checks. Russell informed Defendant Candy Evans of her concern that the checks might not clear, but Defendant Candy Evans reassured Russell, telling her not to worry and that the checks would be cashed. Because of the difficulty in cashing the checks, Russell decided that all future payments from Zancan would have to be in cash. On or about January 27, 2017, at the direction of Nadel, Zancan drove from the Washington, D.C. metropolitan area to New York to deliver $500,000 in cash to Russell, Nadel, Tony John Evans, and Defendants. Over the course of the scheme, Defendant Candy Evans instructed Russell to control Nadel. On one occasion, Nadel wanted to leave the Russell's residence at 141 West 41st Street, New York, New York. Because Defendant Candy Evans would not have wanted Russell to allow Nadel to leave, Russell confined Nadel to the bathroom where the Russell beat Nadel. The government also expects to present evidence that throughout the course of the scheme, everyone understood that money Russell obtained from Nadel would be provided to Defendant Candy Evans, even money that Defendant Candy Evans claimed was for Defendant Robert Evans. The evidence also will show that following the Zancan scheme, Defendant Candy Evans always had a "big brick" of cash hidden in a top shelf of the large "men's bureau" in her residence, including five bundles each containing $10,000 in cash. Evidence will further show that Russell understood that Defendant Candy Evans would take Russell's children from her if Defendant Candy Evans did not get what she wanted from Russell.

5

Evans asked Zancan what type of vehicle he was driving, before directing Zancan to drive to the Fairfield Inn Chelsea in New York. Defendants Archie Kaslov, Robert Evans, and Corry Blue Evans followed Zancan's vehicle, took a photo of the vehicle, and sent that photo to Hollie Ann Nadel to send to Zancan in order to scare him.

On or about January 27, 2017, Tony John Evans and Nadel directed Zancan to deliver approximately $500,000 in cash to Nadel's hotel room in New York, New York. After the delivery of the cash, Tony John Evans retrieved a dark-colored backpack containing cash from Nadel's hotel room and delivered the cash to Defendant Corry Evans's residence at 137 West 28th Street, New York, New York, and to Tony John Evans's residence at 517 Third Avenue, New York, New York.

As further alleged in the Indictment, the government also will present evidence that on or about March 23, 2017, Zancan delivered approximately $2 million in gold bars to the Evans/Kaslov Family in New York. Defendant Kaslov showed Russell a suitcase containing the gold in his and Defendant Candy Evans's residence located at 161 East 33rd Street, New York, New York. The gold was in the form of large bars, approximately the size of a smart phone, and smaller bars, approximately the size of a credit card. Defendant Kaslov remained in his residence to protect the gold and did not leave his residence during the time the gold was stored there. Tony John Evans, and Defendants Robert Evans, Corry Blue Evans, and Kaslov all discussed the need to sell the gold bars, and they eventually sold almost all of the gold.

On October 25, 2017, law enforcement executed search warrants at Tony John Evans's safe deposit box at Santander Bank and four residences in New York, including the residence of Defendants Kaslov and Candy Evans located at 161 East 33rd Street, New York, New York. During the search of the residence of Defendants Kaslov and Candy Evans, law enforcement

recovered evidence related to and proceeds from the fraud scheme, including designer merchandise and expensive watches. During the search, law enforcement also recovered a Smith & Wesson .357 revolver from underneath the mattress in a bedroom, and 35 rounds of .357 ammunition from a dresser and shelf in that same room. The government also intends to present evidence that a few months prior to the execution of the search warrant, a witness observed a large shotgun at the residence of Defendants Kaslov and Candy Evans located at 161 East 33rd Street, New York, New York. During the execution of the search warrants on October 25, 2017, Tony John Evans surrendered to law enforcement a 12-gauge shotgun.

Tony John Evans purchased both the revolver and shotgun in California on May 12, 2016, while he was residing in Sherman Oaks, California. (Purchase receipt attached hereto as Exhibit A). *See also* U.S. v. Tony Evans, 18-CR-103 (EGS), Gov.'s Mem. In Aid of Sentencing, Ex. A (ECF No. 105-1 (purchase receipt for firearms)).

**ARGUMENT**

**I.    THERE IS PROBABLE CAUSE TO BELIEVE THAT DEFENDANTS' DNA MAY CONTAIN EVIDENCE OF A CRIME.**

Probable cause for a buccal swab requires a "fair probability" that the DNA is "evidence of a crime," and that the DNA will be found in the place to be searched, *i.e.*, the defendant, victim, or witness. *See, e.g., Illinois v. Gates*, 462 U.S. 213, 238 (1983);[7] *see generally Zurcher v. Stanford*

---

[7]   Defendants contend that "to obtain a warrant or court order for a genetic sample, the government must show that there exists probable cause to believe that the sample will produce evidence *of the defendant's* involvement in the crime charged." ECF No. 184, at 5 (citing *Schmerber v. California*, 384 U.S. at 769-777) (emphasis added). This is not the correct standard and *Schmerber* does not stand for this proposition. Rather, probable cause exists when "there is a fair probability that contraband or evidence will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238. *See also Maryland v. King*, 569 U.S. 435, 447 (2013) (applying *Schmerber* in noting that while the Supreme Court generally "prefer[s] some quantum of individualized suspicion" when analyzing whether an intrusion is reasonable, "the Fourth Amendment imposes

*Daily*, 436 U.S. 547, 556 (1978) ("[T]he critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought."). "Evidence of a crime" under *Gates* encompasses all relevant evidence.[8] "Relevant evidence" is that which "tends to make a fact of consequence more probable or less probable." Fed. R. Evid. 401. Indeed, the D.C. Court of Appeals has likewise defined relevant evidence as that which "makes the existence of a contested fact that is of consequence to the determination of the action more or less probable than it would be without that evidence." *Jones v. United States,* 625 A.2d 281, 284 (D.C. 1993) (citations omitted). Thus, the defendant's DNA is "evidence of a crime" even where it exculpates, rather than inculpates, the defendant. *See, e.g., Maryland v. King*, 569 U.S. 435, 442 (2013) (DNA testing has the "unparalleled ability both to exonerate the wrongly convicted and to identify the guilty").

As the government noted further in its initial motion, "the taking of a buccal swab following a valid arrest supported by probable cause for a serious offense, even without individualized suspicion of other criminal conduct, does not offend the Fourth Amendment." *United States v. Proctor*, 230 F. Supp. 3d 1, 2 (D.D.C. 2017) (citing *Maryland v. King*, 569 U.S. 435 (2013)). Accordingly, courts have routinely granted the Government's requests for buccal swabs in cases

---

no irreducible requirement of such suspicion" and in the buccal swab context, no such individualized suspicion is required).

[8]     *See also, e.g.*, *In re Morgenthau*, 457 A.2d 472, 475 (N.J. Ct. App. 1983) ("The probable cause necessary for the issuance of a search warrant relates to the existence of material and relevant evidence [of the crime]."). *Cf. Bhd. Locomotive Eng'r v. Rossi*, 290 Fed. App'x 518, 518–19 (3rd Cir. 2008) (probable cause to search witness for blood and urine "to rule out any possibility" that his intoxication contributed to the crime, even where no evidence of witness's "wrongdoing"); *Commonwealth v. Draheim*, 849 N.E.2d 823, 828 (Mass. 2006) (probable cause to search offspring of a rape for DNA which "will probably provide evidence relevant to the question of the defendant's guilt").

where the Government is seeking to compare swabs of suspected DNA taken from firearms with buccal swabs of the Defendants' DNA in order to prove possession of the firearms:

> In this case, the United States's interest is both stronger and more specific. Instead of merely seeking to identify Haight, the government hopes to **link him to the firearms recovered** here by matching his DNA to the genetic material it may locate on the weapons. While in *King*, the DNA collected in a subsequent arrest helped tie the defendant to a prior rape, the collection here is not intended for a general database, but for specific comparison to actual evidence in this case.

*United States v. Haight*, No. 15-cr-88 (JEB), 2015 WL 7985008, at *1 (D.D.C. Dec. 3, 2015) (emphasis added) (citation omitted); *United States v. Lassiter*, 607 F. Supp. 2d 162, 167-68 (D.D.C. 2009) (ordering the defendant to provide a buccal swab for the purpose of potentially connecting him by DNA to evidence in the case).

In this particular case, there is a fair probability that buccal swabs from the Defendants likely contain evidence related to the possession of the unlawful firearms which were recovered in this case. As noted above, there is evidence in this case tying both firearms to the defense and protection of proceeds derived from criminal activity, including but not limited to threats of violence to victims, including minor children, as part of an extortion scheme. *See, e.g., United States v. Pollard*, 946 F. Supp. 48, 50 (D.C. Cir. 1996) (noting strong evidence that firearm constructively possessed was being used to protect the drugs); *see also United States v. Delva*, 922 F.3d 1228, 1255-56 (5th Cir. 2019) (evidence of firearm used to protect and defend proceeds of criminal activity supported sentencing enhancement); *Sealed v. Sealed*, 698 Fed. App'x 194 (5th Cir. 2017) ("Given the facts of this case, it was reasonable to infer that the firearm was present to protect the counterfeit bills or the proceeds of their planned sale against theft.").

Also as noted above, both firearms were purchased in California on May 12, 2016, by Tony John Evans and there is evidence of their involvement in the indicted scheme in New York, raising the fair probability that buccal swabs from the Defendants likely contain evidence related to the

unlawful transfer and receipt of the unlawful firearms. *See* 18 U.S.C. § 922(a)(5) (Transfer of Firearms to Nonresident); 18 U.S.C. § 924(b) (Interstate Transportation of Firearm and Ammunition).[9]

Defendants assert that the charges and text of the Indictment do not allege violent crimes or mention the use of a firearm, and that the charges "can be classified as typical white-collar crimes," suggesting that this negates probable cause. ECF No. 184, at 1. Defendants further argue that there is "no legitimate purpose" for the government's motion, and that the charges against the Defendants do not involve any offenses associated with the possible use of a firearm. ECF No. 184, at 2. As an initial matter, probable cause, not "legitimate purpose" is the correct standard. *Michigan v. Clifford*, 464 U.S. 287, 294 (1984) ("[A] criminal search warrant may be obtained only on a showing of probable cause to believe that *relevant evidence* will be found in the place to be searched." (emphasis added)). And probable cause is not tethered to whether or not an offense is classified as a "typical white-collar crime" or a violent crime, or whether the currently indicted charges mention a firearm. Rather, the *Gates* test is intended to be a "practical and common-sensical standard" where the Court has "rejected rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible, all-things-considered approach." *Florida v. Harris*, 133 S. Ct. 1050, 1055 (2013).

Defendants also argue, "assuming for purposes of the argument, that the Government could trace the DNA recovered from the firearms to this [or any] Defendant, this match would be completely irrelevant as evidence to prove the underlying charges." ECF No. 184, at 2. Defendants continue that "the mere existence of potential traces of DNA recovered from the

---

[9] Individuals in New York City are required to obtain a license to possess a pistol or revolver, and a permit to possess a rifle or shotgun. *See* N.Y. Penal Law § 400.00, *et seq.* None of the Defendants had a license to possess a pistol or revolver required under New York City law.

10

firearms proves nothing other than that, at some point, Defendant[s] could have touched them, which is not a crime." *Id.*, at 3.  Defendants add that, "any Order requiring Defendant[s] to submit to the collection of buccal swabs would be based on mere conjecture about what most likely will not be in evidence." *Id.*  These arguments fare no better and are identical to ones rejected in *Lassiter*.  There, Judge Friedman specifically noted:

> While the defendant argues that "the requested DNA sample is of little, if any, significance" to the ultimate resolution of this case, he cannot know this. If the DNA recovered from the crime scene does in fact match Mr. Hebron's DNA, that evidence would be probative of the government's assertion that Mr. Hebron was at the crime scene and participated in the assault of Mr. Lyles.  Defendant also argues the government has failed to show a need for the sample because its evidence already includes the eyewitness testimony of the victim as well as the statements of various of the co-defendants.  Although the DNA evidence might be duplicative or corroborative of testimony given by the victim and others and their identification of Mr. Hebron as a participant in the charged crimes, DNA evidence is evidence of a different form and nature than eyewitness identification testimony and is not susceptible to the same type of reliability challenges.

607 F. Supp. 2d at 167 (internal citations omitted).

## II.     THE EXISTENCE OF A CONSPIRACY SUPPORTS PROBABLE CAUSE.

Defendants argue that the government's (purported) reliance on a constructive possession with respect to the firearms negates probable cause.  ECF No. 184, at 5.  However, as noted above, the government expects to present evidence of Defendant Kaslov's actual possession of both firearms in the presence of several of his co-Defendant/co-conspirators during the period of the conspiracy in furtherance of the goals of the conspiracy.

Under *Pinkerton v. United States*, 328 U.S. 640 (1946), a conspirator is criminally liable for the substantive offenses committed by a co-conspirator that are reasonably foreseeable and committed in furtherance of the conspiracy.  *See, e.g.*, *United States v. Blackman*, 746 F.3d 137, 141 (4th Cir. 2014).  A defendant can be found liable under *Pinkerton* even if he or she is not charged with conspiracy. *United States v. Budd*, 496 F.3d 517, 528 (6th Cir. 2008); *United States*

*v. Zackery*, 494 F.3d 644, 647-48 (8th Cir. 2007); *United States v. Lopez*, 271 F.3d 472, 480 (3d Cir. 2001). "So long as there is sufficient evidence that a co-conspirator carried or used a firearm in furtherance of the conspiracy and that this was reasonably foreseeable to the defendant, the defendant can be held liable as if he himself carried or used the firearm." *United States v. Flecha-Maldonado*, 373 F.3d 170, 179 (1st Cir. 2004).

Similarly, a person can be found guilty on a theory of conspiracy, aiding and abetting, or constructive possession without ever having touched the contraband at issue. *See, e.g., United States v. Curry*, 494 F.3d 1124, 1128 (D.C. Cir. 2007) (citing *United States v. Harris,* 491 F.3d 440, 453 (D.C. Cir. 2007)); *United States v. Martinez,* 476 F.3d 961, 968-70 (D.C. Cir. 2007); *United States v. Dykes,* 406 F.3d 717, 721 (D.C. Cir. 2005); *see also United States v. McGill*, 815 F.3d 846, 945 (D.C. Cir. 2016) (liability under 18 U.S.C. § 924(c) may be premised on either an aiding-and-abetting or *Pinkerton* theory of liability); *United States v. Long*, 905 F.2d 1572, 1577 n.8 (D.C. Cir. 1990) ("Thus, a defendant involved in a conspiracy, regardless of whether he has possessed a firearm, can be punished as a principal based on the rule of vicarious liability for coconspirator."). However, co-conspirator or accomplice liability is directly tied to the state of that individual's knowledge, participation, and foreseeability – which makes whether or not these particular Defendants touched the two firearms at issue in this case highly relevant and supported by probable cause.

Because the presence of the Defendants' DNA on the firearms would make it more likely than not that they were aware of the use of the firearms during the period of the conspiracy, and aided and abetted or further conspired regarding the continued use of the firearms further supports the "fair probability" that the DNA "evidence of a crime" will be found in the place to be searched, the buccal swabs.

## CONCLUSION

WHEREFORE, for the reasons stated above, and those stated in its initial motion, the United States respectfully requests that its Motion for an Order Requiring the Defendants to Submit to a Buccal Swab be GRANTED.

                                      Respectfully submitted,

                                      JESSIE K. LIU
                                      United States Attorney
                                      for the District of Columbia

By:          /s/
               DAVID B. KENT, D.C. Bar. No. 482850
               KONDI KLEINMAN, CA Bar. No. 241277
               Assistant United States Attorneys
               555 4th Street, N.W.
               Washington, D.C. 20530
               (202) 252-7762 (Kent)
               (202) 252-6887 (Kleinman)
               David.Kent@usdoj.gov
               Kondi.Kleinman2@usdoj.gov