### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | |
| | **:** | **18-CR-103-1-TSC** |
| **GINA RITA RUSSELL,** | **:** | |
| **Defendant.** | **:** | |
| | **:** | |

### GOVERNMENT'S *EX PARTE* MOTION FOR REVOCATION OF DEFENDANT'S RELEASE AND REQUEST THAT THE COURT ISSUE A BENCH WARRANT

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully files this *ex parte* request that the Court issue a bench warrant for defendant Gina Rita Russell based on information recently learned by the government, which establishes that Russell has violated the conditions of her release by engaging in additional criminal conduct. The government also requests that the Court temporarily seal this motion, the proposed order, and proposed bench warrant. The government further requests that the Court hold a hearing, pursuant to 18 U.S.C. § 3148(b), after the defendant is arrested and formally revoke her release conditions at the conclusion of that hearing and order her detained pending sentencing.

### I.    BACKGROUND

#### A.  Facts Regarding the Defendant and the Scheme

As part of her plea agreement with the government, the defendant admitted to the following facts. *See generally* ECF No. 145.

The defendant met Hollie Ann Nadel in New York in or about October 2009 when she performed a psychic reading for Nadel. Nadel paid the defendant increasing amounts of money and items of value for "psychic services" and "spiritual work" and to satisfy "the elders." The defendant told Nadel that bad things would happen to Nadel or her family if money and items were

1

not provided. None of the "psychic services" and "spiritual work" were true, "the elders" did not exist,  and the money that Nadel provided to the defendant was used for the benefit of the defendant and her family.

In addition to money, Nadel obtained loans for the purchase of cars, signed up for credit cards, and paid rent for housing in California and New York for the use and benefit of the defendant and members of her family. Nadel and others working on Nadel's behalf also deposited money into bank accounts of the defendant and members of her family.

Nadel paid for these purchases by obtaining money from her father. The defendant instructed Nadel to tell her father that she needed money for therapy, extensive sleep studies, and classes at New York University, inducing him to provide Nadel large sums of money. She then provided that money to the defendant for the benefit of the defendant and members of her family.

After Nadel's father refused to provide additional financial assistance to Nadel, the defendant and a member of her family encouraged Nadel to use sex to sell herself in order to earn more money. Nadel began to provide sensual massage services, advertising on internet websites.

Beginning in or about November 2016 and continuing through approximately April 2017, the defendant conspired with others to extort and defraud Nadel's sensual massage customers and to obtain money and valuables from them. As part of this scheme, the defendant and others agreed to communicate messages to Daniel Zancan, one of Nadel's clients and the then-CFO of a local Washington, D.C., HVAC company, threatening harm against Nadel, Zancan, and Zancan's family if money and gold were not provided to the defendant and other individuals. The threatening communications included a phone call in which co-conspirator Tony John Evans pretended to be a mobster.

The defendant regularly instructed Nadel regarding what to tell Zancan and other marks to explain the regular and increasing demands for money. Zancan ended up embezzling more than $4 million from his employer as a result of the scheme and delivered the overwhelming majority of the stolen proceeds to the defendant and other individuals with whom she conspired.

### B. Arrests of Zancan, Nadel, Defendant, and Co-Conspirators

Zancan was arrested in April 2017. Nadel was arrested in October 2017, the same day that the FBI conducted search warrants at the defendant's residence and residences of her co-conspirator family members.

In April 2018, the defendant, Tony John Evans, Robert Evans, Corry Blue Evans, Archie Kaslov, and Candy Evans were each indicted for their various roles in the scheme.[1] Arrest warrants were issued for everyone but Tony John Evans; he was issued a summons. Robert Evans, Corry Blue Evans, Archie Kaslov, and Candy Evans all self-surrendered to the FBI. The defendant did not self-surrender; instead, she was arrested on April 27, 2018 in Los Angeles.

### C. Release of the Defendant, Guilty Plea, and Case Reassignment

Following her April 27, 2018 arrest, the defendant was ordered detained by a federal magistrate judge in Los Angeles. After the U.S. Marshals Service transported her to this District, her then-counsel unsuccessfully requested that Judge Sullivan release her. After current counsel was appointed, Russell once again requested that she be released. In her request to be released into the High Intensity Supervision Program, she contended that she did "not pose a danger to the community." ECF No. 58 at 5. She further asserted that "there is no evidence to support the government's contention that the defendant would engage in criminal activity to the detriment of

---

[1] Russell is the ex-common law wife of Robert Evans, who is the brother of Tony John Evans and Corry Blue Evans. The Evans brothers' parents are Archie Kaslov and Candy Evans. All six have pleaded guilty. Russell is the only one who has not been sentenced.

the community" and claimed that she would "abide by all conditions of release and obey all court orders." *Id.* at 8. The government opposed her release. *See generally* ECF No. 67.

At a September 25, 2018, hearing, Judge Sullivan granted the defendant's request to be released from custody and ordered that she be placed into a Halfway House with GPS monitoring. Several months later, she was released from the Halfway House to live in California on GPS monitoring.

On July 30, 2019, the defendant pleaded guilty before Judge Sullivan to one count of interference with interstate commerce by extortion, in violation of 18 U.S.C. § 1951. She admitted to all the facts set forth above in Section I.A.  As part of her plea agreement, she acknowledged that the government would not seek a change in her release conditions pending sentencing, but the plea agreement noted that the government could move to change her release conditions, including requesting that she be detained pending sentencing, if she engaged in further criminal conduct before sentencing. She also agreed that any violation of her release conditions or any misconduct by her could result in the government filing an *ex parte* motion with the Court requesting that a bench warrant be issued for her arrest and that she be detained without bond while pending sentencing.  *See Plea Agreement*, ECF No. 144, Section 8 (Conditions of Release) at p. 6.  The defendant also acknowledged that nothing in the plea agreement allowed her to commit any criminal violation of local, state, or federal law at any time prior to her sentencing in this case. She also agreed to abide by any and all release conditions imposed by the Court. *Id.*, Section 9(f) and (g), at p. 7.

On March 23, 2020, Judge Sullivan granted an unopposed amended motion for bond review and modification to remove the defendant from GPS monitoring; the Court noted that all

other conditions of release remained in effect.[2]  The defendant's Order Setting Conditions of Release specifically prohibited her from violating "federal, state, or local law while on release." ECF No. 109 at 1. The order also noted that violating any release conditions "may result in the immediate issuance of a warrant for your arrest, a revocation of your release, an order of detention… and a prosecution for contempt[.]" *Id.* at 3.

On October 17, 2022, the defendant's case was randomly reassigned to this Honorable Court.

On January 25, 2024, this Court scheduled sentencing for May 17, 2024.

### D.  Criminal Conduct Committed While on Release

While the defendant has been on release in California, she has engaged in additional criminal conduct eerily similar to what she admitted to as part of her plea agreement in this case. V1, a California resident, recently told the FBI that the defendant purported to be a psychic who could help cleanse V1's negative energy. (During the interview, V1 was shown a photograph of the defendant and positively identified her.) The defendant charged V1 money to engage in this cleansing work. The defendant initially was kind and supportive, just as she was with Nadel, but then convinced V1 to lie to her father, a Canadian physician, to get him to wire more than $180,000 to V1, the overwhelming majority of which V1 provided to the defendant. The defendant also convinced V1 to engage in sex work for money and to give the defendant the overwhelming majority of the proceeds. The defendant also convinced V1 to lie to V1's clients to extract more money from them.  V1 also purchased two cars that the defendant and members of her family used.

---

[2] Although the motion was unopposed, there was a misunderstanding between government counsel and defense counsel; the government believed the bond motion was going to keep Russell on an ankle monitor, not remove her entirely. *See* ECF No. 349 at 4.

### E.  V1's Interview with the FBI

During a February 28, 2024, interview, V1 told the FBI the following.

#### 1.  <u>The Defendant Once Again Claims to be a Healing Psychic</u>

In mid-to-late May 2023, V1 met the defendant (who introduced herself as "Lauren") while V1 was walking home from an evening shift working at a restaurant. The defendant was determined to give V1 a psychic reading. The defendant told V1 that they were meant to have met that night and that she sensed something was going on with V1 and that the defendant could help. V1 reported that the defendant then performed a palm reading and seemed to possess genuine insights regarding V1's life and feelings, correctly identifying V1's frustration regarding her lack of consistent success as a performer. The defendant said there was a lot of darkness and negativity following V1 and that it prevented her from succeeding. The defendant charged $300 for the initial palm reading. She and V1 exchanged telephone numbers and the defendant indicated that she wanted to keep in touch and that she could offer assistance with V1's negativity.

Within a couple of days, the defendant and V1 began meeting every few days. During these initial meetings, the defendant did not ask for money. Instead, the meetings consisted of V1 telling the defendant about V1's past so the defendant could determine the sources of negativity and blockages in V1's life.

After learning more about V1's personal history, the defendant claimed that she could do work to counter the negativity. The defendant claimed that she went into deep meditation and prayer on V1's behalf. The defendant said she needed money to do the work and to purchase necessary "materials," such as enormous candles that always had to remain lit. The defendant once showed V1 a picture of a candle as tall as a human. The defendant later told V1 that V1's negativity caused the candle to fall and break, requiring V1 to give the defendant money to replace the candle.

6

After initially asking for roughly $500-$1,000 per week to perform the spiritual work, the defendant suddenly started asking V1 for as much as $5,000 or $10,000. She even asked V1 how much money she could pay the defendant. V1 took out a $15,000 cash advance on her credit card and gave the money to the defendant, who claimed it was needed to make a serious dent in the negativity. In addition to the cash advance, V1 took out a line of credit. She also purchased two cars for the defendant and her family.

Later, V1 gave the defendant V1's Bank of America debit card, which allowed the defendant direct access to V1's bank account funds. The defendant made ATM withdrawals and purchases from V1's account.

### 2. The Defendant Convinces V1 to Lie to Her Father and V1's Friend to Get Money from Them

The defendant asked V1 to obtain money from friends and family so V1 could continue paying the defendant for "the work." For example, the defendant said she needed $50,000. The defendant knew V1's father was a doctor and likely had money. The defendant came up with the idea of telling V1's father and a longtime friend with whom V1 had engaged in a physical relationship that V1 needed to borrow money to pay for an online life coaching course and to pay for studio time to record music. V1 told this lie to her dad and the longtime friend and borrowed $25,000 from each. V1 provided most or all of the money to the defendant.[3]

The defendant said V1 needed believable stories about why she needed the money. She suggested that V1 claim she needed money to go back to school. She also made outlandish

---

[3] A Bank of America statement for V1's account covering the period from May 18, 2023, through June 16, 2023, shows a $24,980 incoming wire from V1's friend on May 19, 2023. The statement also shows a $25,000 cash withdrawal at a teller that same day. That statement does not show an incoming wire of approximately $25,000 from V1's father during that general time period. As detailed below, Bank of America records show multiple wires from V1's father starting on June 15, 2023.

suggestions such as V1 claiming she had cancer or other serious medical conditions that required expensive treatment. V1 knew it would be ridiculous to lie to her father, a doctor, about diseases that she did not have. The defendant also told V1 that she should tell her father that she had been raped and that she needed money for therapy.

The defendant insisted that V1 needed to lie to others because they could not know about the spiritual work. The defendant said telling other people about the work would allow new channels for negativity to enter V1's life.

At one point, the defendant said V1 needed to provide a huge amount of money, possibly $125,000 or $150,000, for spiritual work. The defendant told V1 this money needed to come from V1's dad. The defendant made V1 feel bad about her reluctance to lie to obtain such a large amount of money. V1 decided to tell her parents that an independent record label wanted to sign her to a "fifty-fifty" deal through which V1 needed to provide half the production costs. V1 said she could earn a return on the back end of this alleged music deal. V1's parents agreed to help her financially and began making installment payments of approximately $20,000 to $25,000 per month. V1's father began wiring money to V1's bank account. There was no legitimate record deal and virtually all of the money went to the defendant. Following the wire transfers, V1 withdrew cash and provided it to Russell.

V1 provided bank statements that showed wires to her account from her parents. The government also independently obtained V1's bank account statements from Bank of America. The statements show wires as follows:

| Wire Date | Incoming Wire to V1 from Parents | Withdrawal Date | Subsequent V1 Cash Withdrawal Amount |
|---|---|---|---|
| June 15, 2023 | $40,000 | June 15, 2023 & June 16, 2023 | $20,000 $20,000 |
| June 21, 2023 | $19,980 | June 22, 2023 | $15,000 |
| July 6, 2023 | $19,980 | July 7, 2023 | $20,000 |
| August 8, 2023 | $19,980 | August 9, 2023 | $16,000 |
| September 18, 2023 | $23,980 | September 19, 2023 | $20,000 |
| November 10, 2023 | $24,583.83 | November 10, 2023 | $22,500 |
| December 5, 2023 | $9,980 | December 5, 2023 | $9,000 |
| December 19, 2023 | $24,980 | December 19, 2023 | $22,000 |

In June 2023, V1 also received an approximately $6,500 wire from her longtime friend and then transferred that money via CashApp to the defendant's relative.

### 3.   The Defendant Convinces V1 to Engage in Sex Work for Money and to Get as Much Money out of Clients as Possible

In August 2023, V1 left her job as a server and relied on "sugar daddy" or sex work for all her income. The defendant told V1 she should leave her serving jobs because it was "time to move on." V1 told the defendant she was hesitant because she did not have a degree or marketable skills. The defendant suggested that V1 do "sugar daddy" work. When V1 said she had never even considered something like that, the defendant told V1 about websites such as "Seeking Arrangements" and said women could make good money through this work. The defendant said she had another client who formerly did sex work and obtained as much as $10,000 or $20,000 at one time from her clients.

After V1 agreed to perform sex work for money, the defendant instructed her how much she should charge. The defendant said V1 should charge clients $500 per hour, more for three hours, and $1,500 for overnight. She also provided V1 with specific instructions on things like charging more or less money for sex with or without a condom. V1 said she documented the defendant's pricing instruction in the notes application of her phone.

The defendant told V1 to go to various websites and create profiles to meet clients, and specifically told her to use Seeking Arrangements and sugardaddy.com.  The defendant made it clear to V1 that the money V1 earned through sex work would be for the defendant's spiritual work. The defendant also made V1 believe the sex work would allow V1 to get out of debt, have additional money for herself, and free her from crippling financial worry. V1 believed the sex work could fast track the spiritual work and allow V1 to realize whatever end game existed (which V1 believed was full time work in the music industry and the ability to help others spiritually).

The defendant and one of the defendant's relatives also asked V1 to help with the spiritual work by doing "good works" at their apartment in West Hollywood. Good works included things like laundry, grocery shopping, taking care of the relative's daughter, and cleaning.

V1 wanted out of the spiritual work with the defendant but was worried that terminating it could negatively affect her and people in her life. The defendant made it seem like the spiritual work was critical to V1's safety and the safety of her loved ones.

The defendant encouraged V1 to get as much out of her clients as she possibly could, including prescription medications and additional money. V1 told one man she needed to use his credit card for furniture for her sick mother who was moving; the defendant would then use the credit card for more and more purchases, which eventually caused the man to end his relationship with V1. The defendant also told V1 to tell a man who provided prescription drugs that she needed additional money because she was in debt to loan sharks to whom she owed weekly payments.

### F.    Evidence Corroborating V1

Although the government's investigation is ongoing, thus far, in addition to Bank of America statements that show the incoming wires and withdrawals noted above, additional evidence also corroborates V1.

V1 provided the government with screenshots of iMessages between her and the defendant. In one exchange, the defendant – saved in the victim's phone as "Lauren" – provided V1 with instructions regarding what to tell a man whose credit card V1 (and the defendant) used above and beyond what the man authorized. The defendant's messages are on the left; V1's messages are in blue on the right. Notably, the man was disappointed and angry that V1 used his credit card in ways that he did not intend.





In another exchange, the defendant asked V1 to transfer her $300. She also asked V1 to request that a first-time client advance V1 money before V1's meeting with him.



In another exchange, the defendant asked V1 about getting prescription pills.



She also demanded prescription pills in another exchange.



### G. V1's Identification of the Defendant

During V1's interview with the FBI, she was shown a photograph of defendant Gina Rita Russell and positively identified her.

## II. <u>APPLICABLE LAW</u>

A defendant "who has violated a condition of release, is subject to a revocation of release, an order of detention, and a prosecution for contempt of court." 18 U.S.C. § 3148(a). D.C. Circuit precedent permits the Government to proceed by way of proffer at a detention hearing. *See United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996); *see also United States v. LaFontaine*,

210 F.3d 125, 131 (2d Cir. 2000) ("proffers are permissible both in the bail determination and bail revocation contexts.").

Section 3148(b) directs a judicial officer to revoke a defendant's release and order detention if, after a hearing, the judicial officer –

(1) finds that there is -

> (A) probable cause to believe that the person has committed a Federal, State, or local crime while on release; or

> (B) clear and convincing evidence that the person has violated any other condition of release; and

(2) finds that –

> (A) based on the factors set forth in section 3142(g) of this title, there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community; or

> (B) the person is unlikely to abide by any condition or combination of conditions of release.

18 U.S.C. § 3148(b).

Section 3148(b) also provides,

> If there is probable cause to believe that, while on release, the person committed a Federal, State, or local felony, a rebuttable presumption arises that no condition or combination of conditions will assure that the person will not pose a danger to the safety of any other person or the community.

## III.   ARGUMENT

### A. There is probable cause that the defendant violated her conditions of release by committing felonies.

When Judge Sullivan released the defendant, he ordered her not to violate federal, state, or local law while on release. ECF No. 109 at 1. There is no question that there is probable cause that the defendant has violated multiple criminal laws while on release. She conspired to commit

wire fraud in violation of 18 U.S.C. § 1349 by instructing V1 to lie to her father to get him to wire V1 money, the overwhelming majority of which ultimately was given to the defendant. For the same reason, V1's communications with her father, a resident of Canada, caused an interstate wire, in violation of 18 U.S.C. § 1343, as did any wires from Canada to the United States. The defendant also violated 18 U.S.C. § 1957, which makes it a crime to knowingly engage or attempt to engage in a monetary transaction with proceeds of a specified unlawful activity in an amount greater than $10,000, by, through, or to a financial institution. As detailed above, as a result of lies that V1 told to her father at the defendant's urging, V1 received incoming wires of $19,900 or more on seven separate occasions between June 15, 2023, and December 19, 2023. Accordingly, those funds constituted proceeds of wire fraud—a specified unlawful activity (SUA). Thus, each time V1 withdrew more than $10,000 of those funds at Bank of America for the defendant's benefit, the defendant violated 18 U.S.C. § 1957 and 18 U.S.C. § 1956(h) (conspiracy to commit money laundering). The defendant also has violated numerous laws by encouraging V1 to engage in sex work for money.

### B. The factors in section 3142(g) support the defendant's detention under section 3142(b)(2).

The four factors that the Court must consider under section 3142(g) are (1) the nature and circumstances of the offense; (2) the weight of the evidence; (3) the history and characteristics of the defendant, including her criminal history, and (4) the nature and seriousness of the danger to any person or the community posed by the defendant's release. 18 U.S.C. § 3142(g). The Section 3142(g) factors all warrant the defendant's detention under 18 U.S.C. § 3148(b)(2)(A) and (B).

### 1. The Nature and Circumstances of the Offense

The nature and circumstances of the defendant's newly uncovered criminal conduct are serious. The defendant's most recent actions demonstrate that she has zero remorse for the

behavior that brought her before this Court in the first place. Instead of ceasing criminal conduct, she has doubled down on it. Once again, she has encouraged a woman to lie to her family and engage in sex work for the sole purpose of enriching herself. The defendant's lack of care for others is truly astonishing.

### 2.      Weight of the Evidence

The evidence in this case is strong. V1's description of her experience with the defendant is remarkably similar to Nadel's experience. Moreover, bank statements and text messages corroborate V1's statements.

### 3.      History and Characteristics of the Defendant

The defendant is a master manipulator who has not been deterred from illegally using her powers of persuasion to get people to do whatever she can to help her and her family. Her conduct is nothing short of outrageous. Her promise to Judge Sullivan – that she would abide by all conditions of release – was clearly hollow.

### 4.   Nature and Seriousness of the Danger to any Person or the Community

The defendant has now demonstrated without question that she is a danger to other people and the community and will continue to lie, steal, and cheat without regard to others.

### C.  The Defendant has demonstrated that she is unlikely to abide by any condition or combination of conditions of release and cannot overcome the rebuttable presumption that she should be detained.

Because probable cause exists that the defendant committed various felonies while on release, there is a rebuttable presumption that she should be held. *See* 18 U.S.C. § 3148(b)(2). That presumption exists for good measure. Those who commit felonies after they have been released by a court have demonstrated a complete disregard for court orders. The defendant has done exactly that in this case. Her bail should be revoked.

16

**D. The Court should issue a bench warrant for the Defendant's Arrest and Seal this Motion until the Defendant is arrested.**

This Court has the power to issue an arrest warrant for the defendant based on the Government's motion that she violated her release conditions. *See* 18 U.S.C. § 3148(b). Moreover, the defendant explicitly agreed to the following terms in her plea agreement.

> The Government may move to change your client's conditions of release, including requesting that your client be detained pending sentencing, if your client engages in further criminal conduct prior to sentencing . . . . Your client also agrees that any violation of your client's release conditions [and] any misconduct by your client . . . may result in the Government filing an *ex parte* motion with the Court requesting that a bench warrant be issued for your client's arrest and that your client be detained without bond while pending sentencing in your client's case.

ECF No. 144, Section 8 (Conditions of Release) at p. 6.

The government submits that under *Washington Post v. Robinson*, 935 F.2d 282, 289, n.10 (D.C. Cir. 1991), compelling reasons exist to seal this filing until law enforcement agents arrest the defendant. If the defendant is made aware of this filing prior to her arrest, she might take actions that could endanger the safety of V1, witnesses, and law enforcement agents who will seek to effectuate her arrest. Moreover, she might flee the jurisdiction or take other actions to avoid apprehension. Notwithstanding this sealing request, the government seeks permission to share documents with any agencies that can help effectuate the defendant's arrest.

## CONCLUSION

WHEREFORE, the government respectfully requests that the Court issue an arrest warrant for defendant Gina Rita Russell and seal this motion, the proposed order, and the arrest warrant until law enforcement agents effectuate the arrest of the defendant.

17

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney, D.C. Bar Number 481052

By:     /s/ Kondi J. Kleinman
        KONDI J. KLEINMAN, Cal. Bar No. 241277
        Assistant United States Attorney
        Fraud, Public Corruption, and Civil Rights Section
        601 D Street, N.W. | Washington, D.C. 20530
        kondi.kleinman2@usdoj.gov | 202-252-6887