## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | |
| | : | **Case No.: 18-103-01-TSC** |
| **GINA RITA RUSSELL,** | : | |
| | : | **Sentencing: July 18, 2024** |
| **Defendant.** | : | |

## GINA RUSSELL'S SENTENCING MEMORANDUM

## INTRODUCTION

Gina Russell is 35 years old, has never attended school, and is functionally illiterate. Ms. Russell never had a childhood. She was raised in a household rife with domestic violence and was physically abused by her father–along with her mother and three siblings.

It is undisputed that Gina Russell was introduced to 'psychics' and 'psychic readings' by her Gypsy-Romani mother and father Terri Russell and Angelo Kaslov.  Her parents remained unemployed throughout her life, and at an early age, Ms. Russell's parents forced her and her siblings to sell trinkets and perform psychic readings to obtain money to support the family.

Inexplicably, by age 10, Ms. Russell was drinking alcohol and by age 15 she was smoking marijuana. After having four children almost back-to-back, by age 24, Ms. Russell developed an opioid addiction. In the days leading up to her re-

arrest, she was in the throes of addiction, taking an average of 10 pills every 4-6 hours of either Vicodin, Xanax or Percocet.

Ms. Russell's childhood was also marred by sexual abuse. As a child, an older family member repeatedly sexually abused her. Ms. Russell's mother acknowledged the horrific physical abuse inflicted on her children by their father and characterized Ms. Russell as having "rough life." Ms. Russell's trauma from the sexual abuse remains unabated. Abuse so harrowing and humiliating, she cannot bring herself to retell the details.

What followed that sexual abuse defies human understanding. At 15, Ms. Russell's father forced her into an arranged Gypsy-Romani marriage to **her third cousin** and co-defendant Robert Evans. Her sister younger sister Debbie was also forced into an arranged marriage with **her third cousin** and co-defendant Tony Evans. Archie Kaslov and Angelo Kaslov are first cousins (their fathers are brothers) who paid each other a dowry for their children to marry.

After the incestuous marriage, Gina was quickly forced to begin having sex with her **cousin** and new 'husband.' By age 16, she was pregnant with the first of their four children Abagail. At 17, she was pregnant with her second daughter Lauren. At 18, she was pregnant with her son Archie, and 3 years later she was pregnant yet again with her youngest son Dominique. Ms. Russell has never held a

formal job, instead solely relying on the teachings from her parents to provide 'spiritual work' and 'psychic readings.'

In a tumultuous turn of events, Ms. Russell lost custody of all her children to co-defendants Archie Kaslov (her father's first cousin) and his wife Candy Evans. Co-defendant Evans forced Ms. Russell to obtain a notarized letter relinquishing custody of her children with the promise of returning them to her custody. However, Candy Evans deceived Ms. Russell and had no intentions of returning her children. After obtaining the letter by coercion, Ms. Evans and Mr. Kaslov cruelly challenged Ms. Russell's fitness as a parent and were awarded sole physical and legal custody of *all four* of her children.

It is with this backdrop that Ms. Russell requests that the Court impose a variance and sentence her to 36 months of incarceration. 36 months is a sentence that is sufficient but not greater than necessary to satisfy the goals of sentencing.

## I. PROCEDURAL BACKGROUND

On April 19, 2018, a grand jury returned a 13-count Indictment against Ms. Russell charging her with 1) Conspiracy to Commit Extortion, Bank Fraud, and Wire Fraud, in violation of 18 USC § 371; 2) Interference with Interstate Commerce by Extortion and Aiding and Abetting and Causing an Act to be Done, in violation of 18 USC §§ 1951(a) and 2; 3) Bank Fraud and Aiding and Abetting and Causing an Act to be Done, in violation of 18 USC §§ 1344(2) and 2; 4) Wire

Fraud, in violation of 18 USC §1343; 5) Conspiracy to Commit Money

Laundering, in violation of 18 USC § 1956(h); and 6) Tampering with a Witness

by Corrupt Persuasion or Misleading Conduct, in violation of 18 USC §

1512(b)(3).

Ms. Russell was arraigned on June 1, 2018, in the United States District

Court for the District of Columbia and ordered held without bond at Northern Neck

Regional Jail. Counsel was appointed on July 9, 2018. On October 24, 2018, Ms.

Russell was released to a halfway house-Fairview Residential Re-Entry Center

(RRC) and placed in the High Intensity Supervision Program (HISP). On February

5, 2019, she was released from HISP and allowed to return to California. On

March 23, 2020, based on Ms. Russell's compliance she was removed from GPS

and placed on personal recognizance.

On July 30, 2019, pursuant to a cooperation agreement, Ms. Russell pled

guilty to one count of interference with interstate commerce by extortion in

violation of 18 U.S.C. § 1951. Sections 9 and 15 of Ms. Russell's plea agreement

set forth the specific parameters and the parties' obligations. Prior to her re-arrest,

Ms. Russell remained in compliance with the cooperation agreement for almost 4

years. On March 19, 2024, a bench warrant for Ms. Russell was executed in Los

Angeles, California. She was subsequently transferred to the District of Columbia

and on April 25, 2024, this Court detained her pending sentencing.

## II. <u>FACTUAL BACKGROUND</u>

In 2009, at 24 years old, the same year that she met Ms. Nadel, Ms. Russell gave birth to her fourth child, and began abusing opioids. Ms. Russell's mother remained a constant source of encouragement for her daughter to continue providing 'psychic services,' 'spiritual work,' and 'palm readings."

However, as outlined in Ms. Russell's Statement of Offense, ¶11, Ms. Russell's mother knew none of the "psychic services" were true, and the "spiritual work that Ms. Russell provided Ms. Nadel was not real. Nevertheless, Ms. Russell's mother convinced her daughter to continue with the Gypsy-Romani traditions of providing psychic readings and obtaining money from unassuming clients.

It is not in dispute that Ms. Russell engaged in criminal activity by fraudulently inducing Ms. Nadel and Mr. Zancan to deliver more than 4 million dollars in stolen proceeds. However, in determining the appropriate sentence, the Court should consider that her parents taught and her mother often coerced Ms. Russell to engage in this lifestyle.

Once it became clear to Ms. Russell's mother that her daughter was obtaining money from Ms. Nadel, Ms. Russell's mother manipulated her daughter into depositing large sums of money into her [mother's] bank account. Ms. Russell's mother went even further. To help her daughter secure more money from

Ms. Nadel, Ms. Russell's mother impersonated a therapist on a three-way call to Ms. Nadel's father. The government refers to Ms. Russel's mother as a "con artist" in its sentencing memorandum." *See,* Gov't. Memo p.12. The Court should accept the government's characterization of Ms. Russell's mother. The Court should consider that Ms. Russell was raised by parents who quite literally taught her how to con people out of money under the guise of the Gypsy-Romani culture. While this consideration does not excuse for Ms. Russell's criminality, it certainly explains how Ms. Russell finds herself before this Court facing prison.

When Ms. Nadel's father refused Ms. Nadel's request for more money, Gina Russell's mother encouraged her daughter to convince Ms. Nadel to engage in sex work. For the next year while caring for four minor children, and amid an ever-increasing opioid addiction, Ms. Russell induced Ms. Nadel to obtain more money from one of her suitors Daniel Zancan.

And, while it is true that Ms. Russell accepted a leadership role pursuant to USSG §3B1.1(a), as a part of her plea agreement, it is noteworthy that during Candy Evans' Presentence investigation, the U.S. Probation Department believed that Ms. Evans' conduct warranted a 2-point level increase for a 'managerial or supervisory role' in the conspiracy pursuant to U.S.S.G. §3B1.1(c). Additionally, pursuant to Ms. Evans' plea agreement, under U.S.S.G. § 2B1.1(b)(1)(I), she

agreed to a 2-point increase in her offense level for 'otherwise extensive in scope, planning, or preparation.'

 It should also be noted that as a part of Mr. Kaslov's sentencing memorandum he caused both of Ms. Russell's minor daughters–Abagail and Lauren—to write letters to Judge Sullivan asking that their father (Robert Evans) and grandparents "get less sentencing." *See*, Exhibit A. Noticeably a request for their mother to receive leniency was absent from both children's letters.

Candy Evans' Statement of Offense is telling related to her duress and coercion of Ms. Russell. In March of 2017, Ms. Nadel became aware that the Federal Bureau of Investigation ("FBI") was investigating her involvement with Mr. Zancan.

On April 4, 2017, after being alerted to the investigation, Ms. Evans coerced Ms. Russell and Ms. Nadel to get married. Ms. Evans manipulated Ms. Russell into a second marriage with Ms. Nadel, notwithstanding the fact that Ms. Russell was in an arranged Gypsy-Romani marriage to her son Robert Evans.

Candy Evans told Ms. Russell that "it was her understanding that married individuals could not be compelled to testify against each other," and proposed the marriage to prevent testimony about Ms. Nadel's and Ms. Russell's inducement of Mr. Zancan.

The day after obtaining a marriage license, Ms. Russell and Ms. Nadel were married at City Hall in New York. After Ms. Evans induced Ms. Russell into a same-sex marriage, she became panicked that her and her family would soon be investigated by the FBI for their roles in inducing and threatening Mr. Zancan.

On April 8, 2017, Candy Evans coerced Ms. Russell and Ms. Nadel to sign a handwritten, notarized confession attempting to fully implicate themselves; and exonerate her husband Archie Kaslov and her sons, Tony, Robert and Corry Evans. Ms. Russell complied. *See*, Exhibit B.

Even the presentence investigation report (PSR) writer in this case, concluded that based on Ms. Russell providing false information to the FBI at the direction of Candy Evans, a departure based on coercion and duress may be warranted under USSG §5K2.12.

Just two days after forcing Ms. Russell to exonerate her family in writing, Ms. Evans coerced Ms. Russell to concoct a video admitting her involvement in fraudulently inducing Daniel Zancan. Ms. Evans wanted both a letter and video so that she, her husband, and her sons would not go to jail.

Gina Russell introduced Ms. Nadel to Ms. Evans. But Candy Evans knew her family had enriched themselves by inducing Mr. Zancan, and she was worried about what Ms. Nadel would say to the FBI. Ms. Evans then met in person with Ms. Nadel and told her what to say to the FBI. It was Ms. Evans who then forced

Ms. Nadel to take two Valium so that she "would appear relaxed," when she was interviewed by the FBI.

On October 27, 2021, after the FBI had raided her home, Ms. Evans called FBI Agent Special Agent Major and claimed that Robert Evans, Corry Blue Evans, and Archie Kaslov had committed no crimes, placing the blame squarely on Ms. Russell and Ms. Nadel.

On November 20, 2017, Candy Evans traveled from New York to Washington, D.C. to monitor Ms. Russell's interview with the FBI. Prior to her interview, Candy Evans instructed Ms. Russell to lie to the FBI, exonerate Ms. Evans' family, and place the blame on Ms. Russell and Ms. Nadel. Ms. Russell again complied with Ms. Evans' demands. Candy Evans, her husband, and her sons obtained proceeds from Mr. Zancan that allowed them to purchase a 2015 Rolls Royce. The Evans Kaslov purchases were much more excessive than those made by Ms. Russell. While it is true that Ms. Russell kept cash to live and took trips with her husband and family, Ms. Russell also caused money to be deposited money into her mother's account, as well as into the Evans-Kaslov accounts.

Ms. Russell does not negate her culpability or leadership role in this case. However, the Court should also consider Candy Evans' coercion of Ms. Russell. Based on the unyielding pressure Ms. Evans placed on Ms. Russell to falsely exonerate her husband and sons, the Court should consider her actions when

determining its sentence. Ms. Russell respectfully requests that the Court impose a sentence of 36 months in prison based on the facts and circumstances of this case.

There is no excuse for Ms. Russell's conduct that serves as the basis for her rearrest. However, the Court should consider that Ms. Russell was unstable, depressed and suffering from opioid addiction.

In 2022, Ms. Russell's closest sister, who accompanied her from California to D.C. for court appearances, died suddenly at 28 from a suspected fentanyl overdose. Ms. Russell received the call about her sister's death. This tragic news caused Ms. Russell to further spiral out of control. As noted in the PSR, Ms. Russell never testing positive for illicit substances because Ms. Russell's was abusing prescription drugs.

### III. <u>SENTENCING GUIDELINES CALCULATION</u>

The presentence investigation report (PSR) calculated the guidelines as follows:

USSG §2B3.2(a) Base Offense Level                18;

USSG §2B3.2(b)(1) Express or Implied Threat of Death,

    Bodily Injury, or Kidnapping                2

USSG §2B3.2(b)(2) /2B3.1(b)(7)(F) Loss more than

    $3 million                5

USSG §2B3.2(b)(3)(B)(ii) Demonstrated ability to

carry out Threat of serious bodily harm                3

USSG §3B1.1(a) Aggravating Role: Organizer/Leader     4

USSG §3C1.1 Obstruction of Justice                           2

                                                                          _____

TOTAL:                                                                34

As set forth in the PSR, Ms. Russell has no criminal history points and is in Criminal History Category I. *See,* PSR ¶ 106. The PSR writer concluded that Ms. Russell should not receive acceptance of responsibility credit under USSG § 3E1.1 because she engaged in post-plea criminal conduct. *See,* PSR ¶39. After further review of the lack of the 3-point adjustment for acceptance of responsibility, Ms. Russell objects to the recommended guidelines range of 151 to 188 months' imprisonment. See, PSR ¶ 147.

Specifically, USSG §3E1.1 comment note 4 states "there may, however, be extraordinary cases in which adjustments under both §3C1.1[1] and §3E1.1 may apply." *See*, USSG § 3E1.1, comment (n.4). Ms. Russell's situation is that extraordinary case. Here, Ms. Russell met with the USAO on several occasions and provided 'voluntary assistance in the recovery of the fruits and instrumentalities of the crime;' thus, pursuant to USSG § 3E1.1, (E) a 3-point reduction is warranted.

---

[1] This adjustment is not related to the new alleged criminal conduct rather it was agreed upon enhancement in the plea agreement. *See*, Plea agreement p.3.

Pursuant to her plea agreement, Ms. Russell was also prepared to testify at trial if required. She also served as the catalyst for 4 other guilty pleas against members of her family totaling almost 12 years in prison collectively (60 months for Robert Evans, 41 months for Cory Evans, 30 months for Archie Kaslov, and 12 months for Candy Evans). Additionally, Ms. Russell pled guilty as early as possible in 2019, pursuant to USSG § 3E.1, (H).

Ms. Russell's case, as contemplated by the guidelines, is an extraordinary one where both §3C1.1 and §3E1.1 apply. Here, a 3-point reduction is warranted, and Ms. Russell's guidelines range should be 108-135 months. Notwithstanding this guideline range, the Court should impose a variance and sentence Ms. Russell to 36 months imprisonment.

## IV. STATUTORY FACTORS

18 U.S.C. § 3553(a), requires a sentencing court to "impose a sentence sufficient, but not greater than necessary" to comply with the purposes of sentencing set forth in the second paragraph of the statute. In determining the appropriate sentence, the Court shall consider:

(1) the nature and circumstances of the offense and the

history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect

for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or

vocational training, medical care, or other correctional

treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

(A) the applicable category of offense committed by the

applicable category of defendant as set forth in the

guidelines issued by the Sentencing Commission;

(5) any pertinent policy statement—

(A) issued by the Sentencing Commission;

(6) the need to avoid unwarranted sentence disparities among

defendants with similar records who have been found guilty of similar

conduct; and

(7) the need to provide restitution to any victims of the offense.

*See*, 18 U.S.C. § 3553(a) (1-7).

## **ARGUMENT**

Nearly 20 years after the Supreme Court's decision in *United States v.*

*Booker*, 543 U.S. 220 (2005), it is now "emphatically clear" that the "Guidelines are guidelines – that is, they are truly advisory." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). The Guidelines are no longer "the only consideration" at sentencing, *Gall v. United States*, 552 U.S. 38, 49 (2007). Rather, the Guidelines merely provide a "starting point" for the Court's sentencing considerations. *Id.*; *accord Cunningham v. California*, 549 U.S. 270 (2007). The Court is to impose its sentence after "mak[ing] an individualized assessment based on the facts presented" in each particular case. *Id*. The Court need not find "extraordinary circumstances to justify a sentence outside of the Guidelines range." *Id*. at 47.

### 1. The Nature and Circumstances of the Offense

In this case, Ms. Russell pled guilty to Interference with Interstate Commerce by Extortion in violation of 18 U.S.C. § 1951. The offense conduct is outlined in detail in the Statement of the Offense and Ms. Russell takes full responsibility for her conduct. The Court should consider that Ms. Russell was exploited as a minor and taught by her parents to earn money by providing 'psychic readings' and 'spiritual work.' Ms. Russell does not dispute the conduct set forth in the Statement of Offense and despite the government's claim that she is not remorseful, she sincerely apologizes for her role in inducing Ms. Nadel to obtain millions of dollars from Mr. Zancan.

## 2. The History and Characteristics of the Defendant

Ms. Russell was born to Terri Russell and Angelo Kaslov. She along with her three siblings Debbie, Lisa, and Sophia were raised in a Gypsy Romani family. The Gypsy-Romani traditions are unconventional. The Romani people have long been associated with having psychic powers and are commonly attributed with the invention of Tarot card reading.

In the Romani tradition fortune tellers who perform 'spiritual work' are always female. Ms. Russell, as discussed *supra* was physically and sexually abused by family members. When she was just 15 years old, her father forced her into an arranged marriage to his first cousin's son- her third *cousin* Robert Evans. See, PSR ¶ 121. Born into the incestuous marriage were four children, Abagail (18), Lauren (17), Archie (16) and Domique (10). Despite claims to the contrary, Ms. Russell has never physically abused her children. To date, Candy Evans retains custody of Ms. Russell's children, affording Ms. Russell little to no contact.

## 3. The Purpose of Sentencing

Pursuant to the sentencing statute, a defendant's sentence should be designed: to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical

care, or other correctional treatment in the most effective manner[.] 18 U.S.C. §
3553(a)(2).

While the advisory guideline calculation remains an important
consideration, it is "not the only consideration" in determining the appropriate
sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). To the contrary, the
guidelines "'reflect a rough approximation of sentences that might achieve §
3553(a)'s objectives.'" *Kimbrough v. United States*, 552 U.S. 85, 109 (2007)
(quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)) (emphasis added). A
sentencing court "may not presume that the Guidelines range is reasonable."
*Gall*, 552 U.S. at 50 (citing *Rita*, 551 U.S. at 351).

Rather, the sentencing court must make an "individualized assessment
based on the facts presented." *Gall*, 552 U.S. at 50. Above all, a court's final
determination of a sentence must reflect "§3553(a)'s overarching instruction to
'impose a sentence sufficient, but not greater than necessary,' to accomplish the
sentencing goals advanced in 3553(a)(2)," namely, retribution, deterrence,
incapacitation, and rehabilitation. See *Kimbrough*, 552 U.S. at 111. In making
these individual assessments, sentencing courts are free to disagree with the
guidelines' recommended sentence in any particular case and may impose a
different sentence based on a contrary view of what is appropriate under §
3553(a). This includes the freedom to disagree with "policy decisions" of

Congress or the Sentencing Commission that are contained in the guidelines. See *Pepper v. United States*, 131 S. Ct. 1229, 1241 (Mar. 2, 2011).

To be clear, Ms. Russell does not dispute her guilt, but these specific facts do not warrant more than thirty-six months in prison. This Court can and should impose a variance and sentence Ms. Russell outside of the guidelines.

A 151-month sentence would be twelve times more than Candy Evans received, four times more than Archie Kalsov received, three times more than Corry Evans received, and more than double what Tony and Robert received. A sentence of 151 months in prison would be a sentence far greater than necessary to serve the purposes of sentencing.

### 4. The Punitive Purpose of Sentencing Warrants a Thirty-Six Month Sentence

Section 3553(a)(2)(A) also requires the Court to consider "the need for the sentence imposed ... to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," commonly referred to as punishment, deterrence incapacitation, and rehabilitation. As the plain language indicates, this provision requires the Court to consider these purposes related to the instant offense.

For Ms. Russell even thirty-six months represents significant punishment when measured against her criminal history. The punitive purpose of sentencing

can be achieved with a sentence below the guidelines because it incorporates her time already spent in custody.

While incarcerated Ms. Russell has suffered a host of medical problems which have gone untreated. She has an abscess under her breast which has been bleeding intermittently. She has several gynecological issues which the medical staff at Northern Neck Regional Jail have ignored. Jail life is especially difficult where women live under the stress of constant supervision and are unable to make even the most basic decisions for themselves i.e. medical attention.

**5. The Deterrent and Protective Purposes Warrant a Sentence Below the Guidelines**

The statute also requires the Court to consider the "need for the sentence imposed . . . to afford adequate deterrence to criminal conduct" and the need to "protect the public from further crimes of the defendant." 18 U.S.C. §§ 3553(a)(2)(B) & (C). While some opine that the higher the sentence, the greater the effect in deterring others, empirical research shows no substantial relationship between sentence length and deterrence. The general research finding is that "deterrence works," in the sense that there is less crime with a criminal justice system than there would be without one. However, the pertinent question for this Court is whether a term of imprisonment of 151 months, more than 12 years in

federal prison is minimally necessary to serve the purpose. The answer is simply no.

Even the PSR writer acknowledged that the guideline range is too high and recommended that the Court impose a variance. As justification for the variance, the PSR states

> "Based on the facts of this case, it is plausible that defendant Russell [and Ms. Nadel] may have been coerced or under duress when they provided false information to the FBI. Considering Ms. Russell received an obstruction enhancement for following Candy Evans' directive, a departure for coercion and duress may be warranted. USSG §5K2.12. Should the Court not apply a departure, pursuant to USSG §5K2.12, the Court may consider coercion and duress in the context of a variance."

Here, although the U.S. Probation Department requested a sentence lower than the government, it was still more than eleven years in prison, and the Court should reject both requests. The conduct and circumstances of this case do not warrant such a punitive sentence.

Should this Court have any concerns that a thirty-six-month sentence would not adequately deter Ms. Russell, the ensuing years of supervised release should assuage those concerns. For three additional years after her release, the U.S. Probation Department will strictly monitor Ms. Russell. Any failure by Ms.

Russell to comply with the terms of her supervised release will result in severe repercussions. Thus, imposing a variance and sentencing Ms. Russell to 36 months in prison, with three years of supervised release, is adequate to meet the deterrent purpose of sentencing without resorting to the mechanically determined guideline range.

**6. The Rehabilitative Purpose of Sentencing Warrants a Sentence Below the Guidelines**

Section 3553(a)(2)(D) requires the Court to consider "the need for the sentence imposed… to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." This purpose militates strongly in favor of a sentence below the advisory range. As a preliminary matter, Congress has explicitly directed that "imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a). In other words, locking someone up neither achieves nor is a substitute for rehabilitation or achieving the goals set forth in § 3553(a)(2)(D). Thus, imprisoning Ms. Russell for 151 months cannot be justified as offering her rehabilitation, educational, or vocational training. Accordingly, a thirty-six-month sentence leaves open the possibility that Ms. Russell will be actually be punished and rehabilitated in the most effective manner.

### 7. The Kinds of Sentences Available

The sentencing statute requires the Court to consider "the kinds of sentences available." 18 U.S.C. § 3553(a)(3). A sentence of thirty-six months is consistent with the kinds of sentences generally available.

Ms. Russell pled guilty pursuant to a statute that does not set forth a mandatory minimum term of imprisonment. Therefore, the Court is free to impose a variance and sentence Ms. Russell to thirty-six months, which is well within the kind of sentences available. The Court should reject the government's request for a 151-month sentence.

### 8. Avoiding Unwarranted Disparity

The Court must also consider the need to avoid unwarranted disparities among similar offenders. 18 U.S.C. § 3553(a)(6). However, this preference is not to avoid all disparities at all costs. Rather, it is to avoid unwarranted disparities; disparity remains an ameliorative tool to adjust the guidelines because "[f]air sentencing is individualized sentencing." *Fifteen Years of Guidelines Sentencing*, at 134 (Nov. 2004).

Here, the sentences range from 60 months to 12 months. Based on Ms. Russell's initial cooperation, early guilty plea, and compliance until her rearrest, the appropriate sentence for her is thirty-six months. A 36-month prison sentence is sufficient but not greater than necessary to punish Ms. Russell.

**9. The Need to Provide Restitution**

As noted in the PSR, a special assessment of 100.00 is mandatory, and Ms.

Russell will be ordered to pay restitution in the amount of $4,217,542.86.

## <u>CONCLUSION</u>

For all of the foregoing reasons, and any that may appear to the Court during

the hearing, Ms. Russell respectfully requests that the Court impose a sentence of

thirty-six months followed by three years of supervised release.


Respectfully Submitted,

Brandi Harden, Esq.
Counsel for Gina Russell
Bar No. 470-706
Harden | Law, PLLC
400 7th Street NW, Suite 604
Washington, DC 20004
202.621.8268
b@hardenlawoffices.com